109 T.C. No. 20


UNITED STATES TAX COURT


P.D.B. SPORTS, LTD., BOWLEN SPORTS, INC.,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 730-96.                    Filed December 22, 1997.


An individual purchased more than a 50-percent interest in a partnership, that owned and operated a professional sports franchise. Partnership's presale basis in player contracts was 6X. Because more than 50 percent of Partnership's ownership had changed, P contends that sec. 708, I.R.C., causes a termination and triggers the partnership basis provisions causing a stepped-up basis (to fair market value) in the player contracts to 36X. Partnership claimed amortization deductions using the 36X basis. R contends that sec. 1056, I.R.C., applies and would limit the amortizable basis in the player contracts, even though the contracts were acquired through purchase of an interest in a partnership. Alternatively, R contends that if sec. 1056, I.R.C., does not apply to partnership transactions involving sports franchises, the partnership's basis would be less than claimed under subch. K partnership provisions.

Held: Sec. 1056, I.R.C., does not apply to this partnership transaction involving a sports franchise.

>_Held_, _further_: Partnership correctly computed the basis in the player contracts under the subch. K basis adjustment sections and regulations thereunder.

Richard P. Slivka and Charles D. Henson, for petitioner.

Randall L. Preheim, for respondent.

GERBER, Judge: Respondent issued notices of final partnership administrative adjustments to P.D.B. Sports, Ltd., for the taxable years 1989 and 1990. Among other adjustments, respondent disallowed amortization in the amounts of $1,878,056 and $259,255 for 1989 and 1990, respectively, claimed with respect to professional football player contracts. After concessions, the sole issue remaining for our consideration is whether the partnership, for purposes of determining the amortizable basis in player contracts, is subject to section 1056[1] in addition to, in conjunction with, or instead of the subchapter K partnership provisions. Petitioner contends that the partnership provisions apply exclusively and would, in this case, permit the amortization of the fair market value of the player contracts. Conversely, respondent contends that section 1056 applies to limit amortization to an amount equal to the seller's basis, plus any gain recognized by the seller. In

---

[1] All section and subchapter references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

particular, the controversy centers on whether section 1056 was intended to apply where the buyer acquires a partnership interest in a partnership holding player contracts.

FINDINGS OF FACT[2]

Patrick Bowlen (Bowlen), after graduating from the University of Oklahoma law school, practiced law for 2 years in Calgary, Canada. Thereafter, he began a real estate development business which he operated into the late 1980's. During 1984-85, Bowlen acquired an interest as a general partner in a partnership that was the franchised owner and operator of the Denver Broncos (Broncos) professional football team, a member of the National Football League (NFL). That partnership, P.D.B. Sports, Ltd. (Bowlen I), was a Colorado limited partnership with its principal place of business in Colorado at the time the petition was filed.

Prior to Bowlen's involvement in the Broncos, Bowlen I was 99.75-percent owned by Edgar F. Kaiser, Jr. (Kaiser), a Canadian national.[3] The remaining .25 percent of Bowlen I was also indirectly owned by Kaiser, through a corporation E.F.K. Sports Holdings, Ltd. (Kaiser I). Due to Bowlen's prior interest in

---

[2] The parties' stipulation of facts and the attached exhibits are incorporated herein by this reference.

[3] Bowlen I, prior to the transactions in question and when controlled by Kaiser, had been named E.F.K. Sports, Ltd. When Bowlen acquired a partnership interest, he changed the partnership name from E.F.K. Sports to P.D.B. Sports, Ltd. (referred to as Bowlen I for purposes of this opinion).

purchasing the Broncos, in late 1983, Kaiser approached Bowlen about acquiring an interest in the partnership.

In 1984, Kaiser disposed of his entire interest in Bowlen I, including his interest held through Kaiser I (the corporate entity), in two separate transactions. First, during March 1984, Kaiser sold about 39 percent of the Bowlen I partnership to John R. Adams, through Adams' Colorado limited partnership, J.R.A. Sports, Ltd. (Adams), for $10 million. Second, during March 1984, Kaiser entered into an agreement with Bowlen for the sale of about 61 percent of the Bowlen I partnership. Bowlen's purchase of Kaiser's Bowlen I partnership interest occurred on June 1, 1984. Bowlen purchased about 59 percent of Kaiser's partnership interest for $25,793,100 plus assumption of $34,689,717 in Kaiser's partnership liabilities. At the same time, Bowlen also purchased the .25-percent partnership interest held by Kaiser I for $106,900. Subsequently, Bowlen transferred his aggregated partnership interest (about 61 percent) in Bowlen I to his corporation, Texas Northern Productions, Inc., also known as Bowlen Sports, Inc., (Bowlen II).

On June 1, 1984, Bowlen I was owned as follows:

| Partner | Percentage Ownership | Type of Interest |
| --- | --- | --- |
| Bowlen II | 60.8 | General partner |
| Adams | 39.2 | Limited partner |

Bowlen II's and Adams' aggregate basis in their partnership interests in Bowlen I was approximately $72,242,770. At the time

of Bowlen's purchase, Bowlen I owned the following assets: the NFL franchise for the Broncos, professional football player contracts, a stadium lease, and television rights. Bowlen I's adjusted basis in the player contracts on May 31, 1984, before the sale of the partnership interests to Bowlen II, was $6,510,555.[4]

Bowlen I treated the sale of the partnership interest to Bowlen as causing a section 708(b)(1)(B) termination of the partnership for Federal tax purposes. Adams consented to the transfer of Kaiser's partnership interests to Bowlen and entered into a new partnership agreement with Bowlen II in order to prevent dissolution of the partnership under State law. The Broncos franchise, held by Bowlen I, was not separately for sale. The parties' transactions were in form and substance the sale of partnership interests as opposed to a sale of the underlying partnership assets.

A list of players, whose contracts existed at the time that Bowlen acquired his interest, was used to determine the value of the player contracts. During June 1984, the Broncos' general manager contacted four individuals, including general managers and/or individuals responsible for negotiating player contracts

---

[4] The parties stipulated that the partnership had an adjusted basis in the player contracts on May 31, 1984, in the amount of $6,328,656; however, an exhibit reflects an adjusted basis of $6,510,555. Respondent relied on the amount shown in the exhibit on brief without objection by petitioner. We use the $6,510,555 amount for purposes of this opinion.

at four NFL teams, to wit, Chicago Bears, Cleveland Browns, New York Giants, and Houston Oilers. These four individuals assigned estimated values to the existing Bronco player contracts, which when aggregated totaled $44,325,000, $43,450,000, $59,215,000, and $35,790,000, respectively. The average of these assigned or estimated total values is $45,695,000. Bowlen I's accountant evaluated the assets of the partnership and the values assigned to them by the partnership personnel. The accountant analyzed and adjusted the values of the partnership assets and determined that the fair market value of the player contracts was $36,121,385 as of June 1, 1984, the date of the transfer of the partnership interest to Bowlen. The accountant's analysis was conducted under the approach contained in the subchapter K partnership provisions where the appreciation in the value of the assets over the partnership's presale basis in the assets is allocated to the assets to account for the difference. The difference between the partnership presale basis (approximately $26 million) and Bowlen's and Adams' purchase price for the partnership interests including assumptions of liability (approximately $72 million) was about $46 million.[5] The accountant's asset valuations and conclusions regarding the partnership's basis in the assets, including the player

---

[5] The $72 million basis reflects adjustments made by the partnership that are not germane to this case to account for Bowlen's acquisition costs and Adams' share of partnership income prior to the sec. 708 termination.

contracts, were premised on the assumption that the mandatory basis adjustment rules of section 732(d) applied.

Bowlen I began amortizing the player contracts on June 1, 1984, using a 5-year useful life. After assigning values to the partnership's assets other than the NFL Broncos franchise, the partnership assigned the residual amount of Bowlen and Adams' basis in their partnership interests to the franchise. Bowlen I did not make a section 754 election in 1984. During 1984 through 1988, Bowlen I reported amortization expenses and writeoffs of the player contracts in issue in excess of $34 million.

In September 1985, P.D.B. Enterprises, Inc. (Bowlen III), purchased Adams' 39.2-percent partnership interest in Bowlen I for $20 million. Bowlen III was wholly owned by Bowlen II. During the years in issue, Bowlen I was owned as follows:

| Partner | Percentage Ownership | Type of Interest |
|---------|----------------------|------------------|
| Bowlen II | 60.8 | General partner |
| Bowlen III | 39.2 | Limited partner |

When the 60.80-percent partnership interest in Bowlen I was originally purchased, Kaiser did not provide Bowlen with information about whether Kaiser recognized any gain attributable to the player contracts. Nor did Bowlen ask Kaiser for such information. No evidence was presented at trial by either party about the amount of gain recognized by Kaiser from the sale of his partnership interest to Bowlen or the portion of that gain attributable to player contracts. Evidence of the gain

recognized by Kaiser may have been contained in Kaiser's 1984 Federal income tax return.  The Internal Revenue Service destroyed Kaiser's return as part of its normal practices and procedures for destruction of old tax returns.  Kaiser, a Canadian national, did not testify at trial.

OPINION

I. Background

As part of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, legislation was enacted to address certain tax aspects of transactions involving professional sports franchises. One major aspect concerned the amortization of the costs of player contracts.  Laird v. United States, 556 F.2d 1224 (5th Cir. 1977); First Northwest Indus. v. Commissioner, 70 T.C. 817 (1978), revd. and remanded on other grounds 649 F.2d 707 (9th Cir. 1981).  Section 1245(a)(4) was enacted to require depreciation recapture regarding player contracts when a sports team is sold irrespective of whether the contracts are actually resold.[6]  Concerning the issues in this case, legislation was enacted to prevent a sports team purchaser from allocating more than a fair market value portion of the purchase price to player contracts.

---

[6] Player contracts are sec. 1231 property.  Generally, the sale or exchange of player contracts results in capital gain treatment for the seller's income, subject to the aggregation requirements of sec. 1231.

In particular, it was thought that purchasers of sports franchises were over allocating basis to player contracts and inflating amortization. Congress, by enacting section 1056, sought to employ an approach that would require the seller and buyer to use the same arm's-length or fair market value amount to report income or claim deductions resulting from a sports franchise transaction. Section 1056(a) provides:

> (a) General Rule.--If a franchise to conduct any sports enterprise is sold or exchanged, and if, in connection with such sale or exchange, there is a transfer of a contract for the services of an athlete, the basis of such contract in the hands of the transferee shall not exceed the sum of--
>
> > (1) the adjusted basis of such contract in the hands of the transferor immediately before the transfer, plus
> >
> > (2) the gain (if any) recognized by the transferor on the transfer of such contract.

In addition to equating the buyer's basis with the seller's reporting position, the basis of acquired player contracts may also be affected by the section 1056(d) rebuttable presumption that no more than 50 percent of the purchase price of a sports team is to be allocated to player contracts. To rebut the presumption a taxpayer must "[establish] to the * * * [Commissioner's satisfaction] that a specified amount in excess of 50 percent is properly allocable". Sec. 1056(d).

The question considered here is whether the purchase of an interest in a partnership entity that holds and operates a sports franchise is a sale or exchange of "a franchise to conduct any

sports enterprise" within the meaning of section 1056(a). There was little dispute by the parties about the transactional facts. Upon the transfer of the partnership interest from Kaiser to Bowlen, Bowlen I adjusted its basis in the player contracts to a value of approximately $36 million in accordance with the mandatory basis adjustment rules of section 732(d), accompanying regulations, and related statutes.[7] Bowlen I adjusted its basis in the player contracts without regard to whether Kaiser recognized gain from the player contracts.

Respondent determined that the partnership's basis in the player contracts acquired with the Broncos franchise is limited by section 1056(a), i.e., that the basis of the player contracts is limited to the presale partnership basis in the player contracts ($6,510,555) plus any gain that Kaiser recognized on the sale of his partnership interests allocable to the player contracts. Respondent's determination must be based on the inferential premise that section 1056(a) applies to the indirect purchase and sale of a sports franchise held in partnership form. As there is no evidence that Kaiser recognized gain from the player contracts, respondent also maintains that the basis in the

---

[7] It is noted that the $36 million basis for the player contracts would have fallen within the sec. 1056(d) presumption provision that no more than 50 percent of the total purchase price of a sports team is to be allocable to player contracts. If sec. 1056 applied here, the partnership would not have been statutorily required to establish to respondent's satisfaction the portion of the basis allocation in excess of 50 percent to respondent's satisfaction.

partnership's player contracts is limited to the presale basis in the contracts.

Respondent argues that section 1056 would limit the amortizable basis of the partnership's player contracts in this case. Respondent, however, does not discuss or explain how or if the section 1056 limitation would otherwise affect partnership provisions, including sections 732(d), 743(b) and/or 754 which may have been considered or have been in play in the transaction under consideration. Respondent does not explain whether section 1056 would preempt the application of other basis requirements and/or elections under subchapter K or whether it would be integrated in some manner. These unanswered questions are problematic and complicate our proper analysis of respondent's determination. Additionally, no regulations have been issued under section 1056, although, in the 1976 legislation, respondent was statutorily mandated to issue regulations.

In the alternative, if we decide that the partnership provisions of subchapter K apply to the exclusion of section 1056, respondent argues that the partnership incorrectly computed its basis in the player contracts, and, as a result, no player contract bases remain to be amortized.

II. Section 1056--Does It Apply to Partnership Transactions?

Section 1056 applies to a "sale or exchange" of a sports franchise. In this case, the sports franchise was held in partnership form so that any sale or exchange of a sports

franchise could have only occurred indirectly.  In order for the section 1056 language to literally apply here, respondent must, in some manner, ignore the partnership as an entity.  Respondent makes two separate arguments in support of the section 1056 determination.  First, respondent argues that the sale of the partnership interest constituted a sale of the partnership's underlying assets if the aggregate theory of partnerships is employed.  Respondent's second argument poses a theoretical sale or exchange to address that section 1056 requirement.  Respondent contends that the sale of a partnership interest causes a constructive partnership termination resulting in a deemed distribution of partnership property and a deemed contribution of the property to a new partnership.  Under respondent's second argument, the deemed distribution and contribution are hypothesized to be the section 1056 "sale or exchange" of the partnership's property.[8]

We note that respondent does not contend that the Bowlen I partnership is a sham or should be disregarded because it had been created to avoid the application of section 1056.  In addition, respondent does not argue that Bowlen acquired the assets of Bowlen I in a two-step transaction over the 1984-85 period.  We agree with petitioner and hold that there was no

---

[8] Respondent, in the second argument, alternatively attempts to address how a "sale or exchange" could occur even if we were to hold that sec. 1056 should be applied to subch. K transactions under the entity theory.

"sale or exchange" of a sports franchise or player contracts within the meaning of section 1056.

In general, the sale of a partnership interest does not affect the basis of partnership property, and the issue of whether section 1056 should apply to the sale of a partnership interest would be irrelevant. A partnership may be able to increase the basis of certain assets upon a sale of a partnership interest where the sale causes a constructive termination of the partnership. See sec. 708(b)(1)(B). Section 708(b)(1)(B) provides for a partnership's termination on a sale or exchange of 50 percent or more of the total interest in the partnership's capital and profits within a 12-month period. The termination results in a deemed distribution of partnership property to the new and continuing partners (Bowlen and Adams) and a deemed recontribution of the property to a newly formed partnership. Sec. 1.708-1(b)(1)(iv), Income Tax Regs.

Section 1.708-1(b)(1)(iv), Income Tax Regs., states, in pertinent part:

> (iv) If a partnership is terminated by a sale or exchange of an interest, the following is deemed to occur: The partnership distributes its properties to the purchaser and the other remaining partners in proportion to their respective interests in the partnership properties; and, immediately thereafter, the purchaser and the other remaining partners contribute the properties to a new partnership * * * For election of basis adjustments by the purchaser and other remaining partners, see sections 732(d) and 743(b) and paragraph (d) of section 1.732-1 and

paragraph (b) of section 1.743-1.[9]  [Citations omitted.]

Upon a distribution of partnership property, each partner's basis in his partnership interest is allocated among the distributed assets in proportion to the assets' respective bases to the partnership.  Sec. 732(b) and (c).  The partnership's bases in its assets may be adjusted under section 743(b) before the partnership distribution to reflect changes in the fair market value of partnership property in relation to the partnership's adjusted bases in the assets.  The partnership's basis, after being adjusted in accord with section 743(b), is then used to allocate basis among the distributed assets.  Upon recontribution of the property to the new partnership, the partnership takes the partner's basis in the property at the time of contribution.  Sec. 723.

In this case, a section 708(b) constructive termination would have occurred due to the sale of more than a 50-percent partnership interest.  The assets of Bowlen I, including the Broncos franchise and professional football player contracts, would be deemed to have been distributed to Bowlen and Adams and recontributed to a new partnership.  Sec. 1.708-1(b)(1)(iv),

---

[9] Sec. 1.708-1(b)(iv), Income Tax Regs., was amended by T.D. 8717, 1997-24 I.R.B. 5 (May 8, 1997), to apply to sec. 708 terminations occurring after May 8, 1996.  The amended regulation would not apply in this case.  The changes may cause a result different than the one dictated by the regulations in existence for the 1984 taxable year, the year in which a sale of a 50-percent interest in Bowlen I occurred.

Income Tax Regs. Prior to the deemed distribution, the bases of Bowlen I's assets would be adjusted to reflect their fair market values under section 743(b) based on the assumption that the mandatory basis adjustment of section 732(d) applied.[10] Upon the deemed distribution, Bowlen I would use the fair market values of the assets to allocate Bowlen's and Adams' bases in their partnership interests among the partnership assets pursuant to section 732(c) basis allocation rules. Bowlen I followed the above-outlined statutory process and did not consider the amount of gain that the selling partner (Kaiser or his wholly owned corporation) may have recognized on the player contracts or the terminated partnership's presale basis in the contracts in determining the contracts' basis. Therefore, Bowlen I's basis in the player contracts was determined without reference to the section 1056(a) basis limitation requirements.

A. Respondent's First Argument--Section 1056 If Applied to a Subchapter K Transaction Using the Aggregate Approach to Partnerships Would Result in a "sale or exchange" of a Sports Franchise and Player Contracts Within the Meaning of That Section

Section 1056(a) specifically applies to a "sale or exchange" of a sports franchise. There is no reference to indirect transfers of sports franchises through intermediate entities,

---

[10] Respondent challenges whether Bowlen I was entitled to adjust the assets to their fair market values and use the fair market values to allocate bases among the assets under the partnership provisions. Respondent argues that Bowlen I should have allocated bases among its assets in proportion to the terminated partnership's presale adjusted basis in the assets. This matter is addressed later in the opinion.

such as a partnership.  Section 1056 has not previously been considered by any court.  Significantly, although regulations are mandated in the statute, since its enactment 20 years ago, none have been issued.  The absence of regulations (interpretative or legislative), however, does not limit our ability to interpret the statute and decide the issues presented in this case.

In construing a statute, we generally give effect to the plain and ordinary meaning of its language.  United States v. Locke, 471 U.S. 84, 93, 95-96 (1985); United States v. American Trucking Associations, Inc., 310 U.S. 534, 543 (1940).  Words with a fixed legal or judicially settled meaning, on the other hand, generally must be presumed to have been used in that sense unless such an interpretation would lead to absurd results.  See United States v. Merriam, 263 U.S. 179, 187 (1923); Lenz v. Commissioner, 101 T.C. 260, 265 (1993).  Our principal objective in interpreting any statute is to determine Congress' intent in using the statutory language being construed.  United States v. American Trucking Associations, Inc., supra at 542; General Signal Corp. & Subs. v. Commissioner, 103 T.C. 216, 240 (1994), supplemented by 104 T.C. 248 (1995).  When a statute is ambiguous, we may look to its legislative history and the purposes for its enactment.  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Peterson Marital Trust v. Commissioner, 102 T.C. 790, 799 (1994), affd. 78 F.3d 795 (2d

Cir. 1996). In addition, we may seek out any reliable evidence as to the legislative purpose even where the statute is clear. United States v. American Trucking Associations, Inc., supra at 543-544; Centel Communications Co. v. Commissioner, 92 T.C. 612, 628 (1989), affd. 920 F.2d 1335 (7th Cir. 1990). We use these general principles of statutory interpretation to determine the scope of section 1056 and/or the application of the subchapter K basis adjustment rules.

The parties couch the question of whether section 1056 applies to the sale of an interest in a partnership holding a sports franchise in terms of the threshold inquiry of whether a partnership should be treated as an entity or aggregate. As explained above, respondent seeks to employ the aggregate approach to cause a more direct relationship to the partnership's assets when an interest in the partnership changes hands. Conversely, petitioner contends that the partnership should be treated as an entity for purposes of our consideration of section 1056. In determining whether section 1056 should apply to the sale of a partnership interest, our analysis considers both the legislative intent in enacting section 1056 and the structure and scope of the subchapter K basis adjustment rules.

## 1. Legislative Intent With Regard to the Application of Section 1056 to Partnership Transactions

"The theory concerning partnerships as entities is not easily defined. It is well established that the partnership form

is a hybrid--part separate entity, part aggregate." Schneer v. Commissioner, 97 T.C. 643, 660 (1991). For purposes of interpreting Code provisions outside of subchapter K, a partnership may be treated as either an entity, separate from its partners, or an aggregate of its partners depending on which characterization is more appropriate to carry out the intent and/or purpose of the particular Internal Revenue Code section under consideration. Brown Group, Inc. & Subs. v. Commissioner, 104 T.C. 105, 116 (1995), vacated and remanded on other grounds 77 F.3d 217 (8th Cir. 1996); Casel v. Commissioner, 79 T.C. 424, 432-433 (1982).

Respondent argues that Congress intended section 1056 to apply broadly, to include the sale of an interest in a partnership that operates a sports franchise. Respondent contends that the section 1056 legislative history contains indications that Congress sought to prevent inconsistent player contract valuations by sellers and buyers of sports teams. Finally, respondent contends that if section 1056 is not applied to the sale of a partnership interest, inconsistent valuations of player contracts could occur, contrary to congressional intent. Relying on those points, respondent maintains that it is appropriate to apply the aggregate theory of partnerships for purposes of section 1056's application to partnership transactions to prevent this perceived abuse.

Petitioner contends that section 1056 is unambiguous, makes no reference to partnership transactions, and applies only to transactions directly involving sports franchises not including the sale of a partnership interest. Finally, petitioner argues that legislative history is inconclusive and, in any event, irrelevant because the statute is unambiguous. Because partnerships can be and have been treated as an aggregate or entity, we must disagree with petitioner's contention that section 1056 is unambiguous. Petitioner is of the view that the entity approach is to be applied to Internal Revenue Code provisions that are outside of subchapter K unless Congress provides otherwise. No such presumption favoring the entity approach exists.

Congress used the pervasive tax terminology "sale or exchange" to categorize the transactions subject to section 1056(a) basis provisions and limitations. Two types of transfers of sports franchises were expressly exempted from the section 1056(a) basis limitation, section 1031 like-kind exchanges and transfers from a decedent. Sec. 1056(b). Neither exception references partnership interests or provides guidance, one way or the other, on the congressional intent. Section 1056 does not mention the transfer of an interest in a partnership holding a sports franchise. Moreover, the legislative history does not contain any reference to the imposition of the basis limitation rules of section 1056 on the transfer of partnership interests.

The legislative history emphasizes that section 1056 was enacted to prevent inconsistent valuations of player contracts by purchasers and sellers of professional sports franchises. H. Rept. 94-658, at 115-117 (1975), 1976-3 C.B. (Vol. 2) 695, 807-809; S. Rept. 94-938 at 87-88 (1976), 1976-3 C.B. (Vol. 3) 49, 125-126.[11] Section 1056 was intended to cause the tax consequences on the sale of sports franchises to be subject to an arm's-length and balanced posture. That is accomplished by using the seller's basis plus any gain recognized by the seller as the standard for the buyer's basis in player contracts. H. Rept. 94-658, at 117; 1976-3 C.B. (Vol. 2) at 809; S. Rept. 94-938 at 87-88, 1976-3 C.B. (Vol. 3) at 125-126.

We disagree with respondent's contention that inconsistent valuations of player contracts would automatically occur in transactions involving a sports franchise held within a partnership. Provisions within subchapter K protect against inconsistent valuations of partnership property by buying and

---

[11] The purchaser of a sports franchise would be motivated to allocate a larger portion of the purchase price to player contracts because the costs of player contracts are amortizable. Likewise, there would be less motivation to allocate cost to the franchise rights and goodwill which are not amortizable. Conversely, sellers would be motivated to allocate little of the purchase price to player contracts because gain recognized on the sale of player contracts may be subject to sec. 1245 depreciation recapture and treated as ordinary income. Sellers would also be motivated to allocate a larger portion of the purchase price to unamortizable assets, such as franchise rights, any gains on which may be taxable at capital gain rates and are not subject to recapture provisions.

selling partners. Under section 751, the selling partner (Kaiser) would be required to recognize any gain attributable to the amortization deductions on the player contracts as ordinary income. Sec. 751(a), (c). Section 751 would prevent the selling partner from converting section 1245 depreciation recapture income from the player contracts into capital gain. Accordingly, without considering section 1056, the seller's reporting requirements are congressionally mandated under subchapter K and section 1245. The selling and buying partners are bound to allocate the purchase price of the partnership interest to particular section 751 partnership assets as provided in the terms of their sales agreement. Sec. 1.751-1(a)(2), Income Tax Regs. There is no subchapter K provision similar to section 1056;[12] however, under subchapter K, the focus is not on inconsistent asset valuations by individuals buying and selling partnership interests.

Respondent also relies on the Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976 (J. Comm. Print 1976) (hereinafter General Explanation) as support for the position that the term "sale or exchange" as used in section 1056 includes a sale of a partnership interest in a sports team. The General Explanation states at 86 that section

---

[12] Under sec. 1056, to prevent a buyer from inflating the basis of player contracts, the buyer is limited to the seller's basis and any recognized gain on the contracts.

1056 applies to "the sale, exchange, or other disposition of a sports franchise." The General Explanation is prepared by the staff of the Joint Committee on Taxation and is generally not considered to be legislative history. Courts, however, have referenced the General Explanation in opinions involving the interpretation of statutes. See, e.g., FPC v. Memphis Light, Gas & Water Div., 411 U.S. 458, 471-472 (1973); Todd v. Commissioner, 89 T.C. 912, 917-918 (1987), affd. 862 F.2d 540 (5th Cir. 1988). In any event, the General Explanation does not contain elucidation or clear guidance on the application of section 1056 to transfers of partnership interests, as respondent argues. The General Explanation contains the amorphous phrase "other disposition of a sports franchise" which we find inconclusive on the question of whether partnership transactions are covered by section 1056. To accept the "other disposition" language as including the transfer of a partnership interest would, of necessity, require us to ignore and/or circumvent certain of the subchapter K special basis adjustments available to a buying partner and other basis provisions governing partnership transactions.

In that connection, the integration into subchapter K of a basis limitation like that contained in section 1056 would be a complex and arduous task. Subchapter K already contains a complex and comprehensive set of basis provisions designed to address the unique aspects of a pass-through entity. Such an

integration would present numerous choices and policy decisions that the statute, legislative history, and respondent have failed to address.

Section 1060 provides an example of the integration of basis rules into subchapter K. Section 1060 was enacted in 1986 subsequent to the transaction in question and is inapplicable in this case.[13] Nevertheless, the enactment of section 1060 provides an example of the complexity and difficulties involved in a section 1056 integration into partnership transactions.

Sections 1056 and 1060 each control the allocation of purchase price to individual assets, albeit by different means. Section 1060 requires the seller and buyer in certain prescribed asset sales to allocate the purchase price among acquired assets using the residual allocation method. Under that method, a taxpayer generally allocates the purchase price among acquired assets to the extent of their fair market values in descending order of priority starting with cash and tangible and intangible assets other than goodwill and going concern value. Sec. 1060(a); sec. 1.1060-1T(a)(1), (d), Temporary Income Tax Regs., 53 Fed. Reg. 27039, 27040 (July 18, 1988). The residual of the purchase price is then allocated to goodwill and going concern value. Sec. 1.1060-1T(d), Temporary Income Tax Regs., 53 Fed.

---

[13] Sec. 1060, enacted by sec. 641(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2282, applies to asset acquisitions after May 6, 1986, unless entered under a binding contract in effect on that date and at all times thereafter.

Reg. 27040 (July 18, 1988). Allocation of the purchase price to the individual assets determines the seller's gain or loss on the sale of the assets and the buyer's bases in the acquired assets.

As initially enacted, section 1060 did not address the transfer and allocation involving partnership interests. In 1988, section 1060(d) was added specifically to require the use of the residual method for distributions of partnership property to partners and for transfers of partnership interests for purposes of determining the value of goodwill or going concern value in applying section 755. The 1988 amendment included detailed provisions to enable section 1060 principles to be integrated into the generally self-contained provisions of subchapter K. The absence of express provisions in section 1056 to address partnership transactions more likely indicates that it does not apply to basis adjustments available to partners who purchase partnership interests. Any ambiguity or omission in section 1056 logically could have been cured by amendment.

### 2. Interplay Between Section 1056 and the Subchapter K Partnership Provisions

In deciding that section 1056 does not apply to the sale of a partnership interest, we have considered the effect that section 1056 would have on the integrity and continuity of subchapter K. In that regard, petitioner contends that we should not apply section 1056 on an ad hoc basis to subchapter K because to do so would undermine the partnership basis provisions.

Subchapter K contains several detailed provisions governing basis adjustments and allocations in partnership transactions. See secs. 732, 743, 754, and 755. Generally, subchapter K employs the entity approach in treating transfers of partnership interests. The sale of a partnership interest is treated as the sale of a single capital asset rather than as a transfer of the individual assets of the partnership. See secs. 741 and 742.

Aggregate concepts, however, are also employed upon the transfer of partnership interests. For example, the basis of partnership property may be adjusted under the partnership provisions upon the sale of a partnership interest in accordance with section 743(b). The basis adjustment under section 743(b) places a buying partner in the same position as if that partner had purchased an undivided proportionate share of the partnership property. Section 743(b) enables the purchaser of a partnership interest to increase the depreciable basis of appreciated partnership property to parallel the acquisition costs. Section 743(b) also protects a new partner by increasing basis to avoid taxation on any inflated gains that could occur if the partnership interest is later sold.

These basis adjustments were statutorily provided to individuals who purchase partnership interests, and we are reluctant to vary from this approach without a clear legislative mandate for partnerships owning sports franchises. The partnership here applied the section 743(b) special basis

adjustments believing that the mandatory basis adjustment of section 732(d) applied. The mandatory basis adjustment prevents a buying partner from shifting basis allocation from nondepreciable or unamortizable property to depreciable or amortizable property under the section 732(c) basis allocation. Similarly, section 1056 is intended to prevent overvaluation of amortizable player contracts and undervaluation of the unamortizable sports franchise by buyers of sports teams. The only difference, however, is that the partnership provisions do not restrict the basis adjustment of a particular partnership asset to the partnership's presale basis plus any gain recognized by the selling partner.

We are satisfied that subchapter K provisions are sufficient to determine the basis of partnership property and include sufficient safeguards (such as section 732(d) and accompanying regulations) to prevent inflation of the depreciable or amortizable basis of property.[14] We are also satisfied that Bowlen I did not overvalue the player contracts in issue. In some respects, the partnership's player contract valuation complies with the section 1056(d) provision involving the

---

[14] We recognize, however, that subch. K may permit a purchaser of a partnership interest to obtain increased amortizable basis in the player contracts even though the selling partner may not have recognized depreciation recapture income on those contracts. This could occur when a buying partner and selling partner have not allocated the total purchase price of the partnership interest among the individual partnership assets in a sales contract.

presumption and requirements for allocating more than 50 percent to player contracts. Bowlen I obtained four estimates of the value of the Broncos' player contracts on the date of the sale of the partnership interest from general managers and personnel specialists of other NFL teams. The estimates ranged from $35,790,000 to $59,215,000, with an average amount approximating $45,700,000. Bowlen I assigned approximately $36 million as the fair market value of player contracts, which amount equates with 50 percent of the approximate $72 million aggregate cost for Bowlen and Adams' partnership interests. It should be emphasized that a conservative valuation was used, and (as explained later in this opinion) we find this assigned value was the fair market value at the time of acquisition.

Petitioner's argument focuses on the factor that Kaiser's gain attributable to the player contracts should have been derived from the $36 million amount used by the partnership for amortization purposes. Respondent, however, focuses on petitioner's inability to prove the actual amount of gain that Kaiser recognized from the contracts, under the basis limitation rules of section 1056(a). Neither party offered direct evidence showing the gain, if any, that the seller (Kaiser) may have recognized on the sale of the partnership interests attributable to the player contracts. Without such evidence, as required under section 1056(a), respondent argues that the basis in the player contracts is limited to the partnership's presale basis.

Further exacerbating the dilemma here, respondent, in accord with established practices, destroyed the seller's income tax return that might have shed light on this question.

The $36,121,385 basis for the player contracts used by the partnership does not exceed the value of the contracts or provide any tax benefit not otherwise available to the partners. Amortization of the fair market value in accord with the partners' acquisition costs for partnership property is an appropriate deduction under subchapter K. Any tax advantage that may have occurred in the circumstances of this case would have been due to the seller's (Kaiser's) failure to report sufficient gain or his mischaracterization of gain as capital upon the sale of his partnership interest. Respondent argues, but is unable to show, that Kaiser was able to have the benefit of capital gain on the sale of his partnership interest without recapture in the form of ordinary income of any amortization that may have been taken on the player contracts.

B. Respondent's Alternative Argument--A Deemed Distribution and Recontribution of Partnership Property Under Section 731 Constitutes a "sale or exchange" Within the Meaning of Section 1056

Respondent alternatively argues that if we hold that a partnership is to be treated as an entity for purposes of applying section 1056, a sale or exchange of the partnership assets nevertheless occurred under the entity theory. Responent's alternative argument is premised on the contention

that a sale or exchange of a sports franchise and player contracts within the meaning of section 1056(a) occurred on the deemed distribution and recontribution of partnership property attributable to the partnership's constructive section 708 termination. Respondent relies on section 731 as support for the position that an exchange occurs when a partnership makes a liquidating distribution of partnership property to its partners.[15]

Section 731(a) defines the circumstances under which a partner recognizes gain or loss from partnership distributions and provides that "Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner."[16] Sec. 731(a). Respondent maintains that there is tacit recognition in section 731 that a deemed partnership distribution constitutes a sale or exchange regardless of whether the partner recognizes gain or loss on the distribution. Respondent, relying on section 721, continues with the additional premise that the deemed recontribution of the partnership

_____

[15] It is noted that any distribution of property in this case would have been theoretically deemed to have occurred under the statutes and regulations and that no actual distribution in kind occurred.

[16] Generally, a partner recognizes gain upon the distribution of partnership property only to the extent that money distributed exceeds the partner's basis in his partnership interest. Sec. 731(a)(1).

property to the new partnership is an exchange.  Section 721 provides that "No gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership."

Respondent's reliance on section 731 is misplaced.  The purpose of the above-quoted portion of section 731 is to characterize the gain or loss recognized on partnership distributions as capital or ordinary in nature.  See sec. 1.731-1(a)(3), Income Tax Regs.  Section 741 provides for the characterization of income or loss from the sale or exchange of a partnership interest as capital, except as provided in section 751 (relating to unrealized receivables and inventory items that have substantially appreciated in value).  Section 731(a), in turn, subjects the tax consequences of partnership distributions to the gain or loss characterization rule of section 741.  Moreover, section 731(a) provisions apply to nonliquidating and liquidating distributions.  It would be inappropriate to treat partners who receive current distributions from a partnership as selling their partnership interests, which respondent's argument would seem to require.  Rather, a partner who receives a nonliquidating distribution is treated as selling his partnership interest only for purposes of characterizing the gain recognized by the partner.

The phrase "sale or exchange" appears in several tax statutes and has been the subject of numerous opinions. The customary meaning of "sale or exchange" implies a reciprocal transfer. Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247, 249 (1941). The phrase "sale or exchange" has been interpreted in some circumstances to include a distribution of partnership property in liquidation of a partnership interest. However, a partnership distribution does not necessarily qualify as a sale or exchange. For example, a liquidating distribution of a 50-percent or more partnership interest is not treated as a sale or exchange of the partnership interest for purposes of a section 708(b)(1)(B) constructive termination. Sec. 1.708-1(b)(1)(ii), Income Tax Regs. Whether a partnership distribution is a sale or exchange of the distributed partnership property depends on the statutory mandate of the section sought to be applied to the particular subchapter K transaction.

Respondent's second or alternative argument to apply section 1056 to subchapter K transactions would raise difficult and yet unanswered questions, such as whether the partnership or selling partner should be considered to be the transferor of the assets for purposes of section 1056. Under respondent's view, the buying partner's basis would be limited to the terminated partnership's presale basis plus gain recognized by the selling partner (Kaiser) on the player contracts. Section 1056(a) limits the buyer's basis in player contracts to the transferor's basis

plus gain recognized by the transferor on the contracts.
Accordingly, respondent's position requires both the selling
partner (Kaiser) and the terminated partnership to be treated as
the transferor for purposes of section 1056 on the deemed
distribution.

The section 708 regulations provide that the deemed
distribution is from the terminated partnership.  Sec. 1.708-
1(b)(1)(iv), Income Tax Regs.  The normal rule is that a
partnership does not recognize gain on a liquidating distribution
to a partner.  See sec. 732(a).  Consequently, if only the
terminated partnership was treated as the transferor for purposes
of section 1056(a), a buying partner would be limited to the
partnership's presale basis in the contracts even if the selling
partner recognized gain from the player contracts.  Respondent
does not seek that result.

For Kaiser to be the transferor (seller) on the deemed
distribution, however, the aggregate partnership theory would
need to be employed.  Consistent with our prior discussion, the
aggregate theory of partnership would not be appropriate for
purposes of section 1056.  Respondent's argument that a section
1056 "sale or exchange" occurs on a deemed distribution and
recontribution requires treating the partnership as an aggregate
of its partners.  Accordingly, we conclude that a partnership
distribution does not constitute a sale or exchange of the

distributed partnership assets under section 1056, and Bowlen I's basis in the player contracts is not subject to section 1056.

III.  Has Bowlen I Correctly Computed the Basis of Partnership Assets Under the Partnership Provisions?

A.  Burden of Proof as to Fair Market Value of Player Contracts

As a threshold and procedural matter, petitioner argues that any question concerning the partnership's basis computation under the partnership provisions is a new matter for which respondent should bear the burden of proof.  Rule 142(a).  Petitioner contends that respondent raised the question concerning the subchapter K basis computation for the first time at trial and that issue constitutes a new matter.  Respondent argues that, although this issue was not addressed in the notices of final partnership administrative adjustment, petitioner raised the issue by alleging in the pleading that the player contracts' bases were correctly determined under subchapter K.

Respondent, under section 1056, determined that the partnership was not entitled to amortization of certain player contracts for the years under consideration.  Petitioner alleged that respondent erred in applying section 1056 and not accepting the approach utilized by the partnership.  Petitioner's allegations in the petition address the question of whether the section 1056 limitations would affect the amount of basis available for amortization.  In the notice of final partnership administrative adjustments, respondent did not determine that the

basis amount used by the partnership for the player contracts was incorrect, except insofar as it was limited by the requirement of section 1056(a).

> Generally, * * * [taxpayers] [bear] the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent, however, bears the burden of proof as to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a). A new position taken by * * * [the Commissioner] is not necessarily a "new matter" if it merely clarifies or develops * * * [the Commissioner's] original determination without requiring the presentation of different evidence, being inconsistent with * * * [the Commissioner's] original determination, or increasing the amount of the deficiency. Achiro v. Commissioner, 77 T.C. 881, 889-891 (1981) * * * . [Citations omitted.]

Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 169 (1994).

Respondent raised, for the first time at trial, the question of whether the partnership correctly valued partnership assets and hence was required to use section 732(d) to allocate partner acquisition costs to basis. That question or issue was raised by respondent as an alternative argument if we should find that section 1056 did not apply. Petitioner, up until the trial, simply argued that section 1056 did not apply as determined and that the partnership's reporting position was, therefore, correct.

Going into the trial, the sole issue confronting petitioner was whether the limitations of section 1056 applied to the partnership's basis in player contracts. Petitioner had

stipulated the estimates made by the four NFL teams and the adjustment made by the partnership's accountant to arrive at a $36,121,385 fair market value and basis for the player contracts. That evidence was stipulated to provide background for the factual scenario needed to address the section 1056 question. Petitioner did not plan to offer expert testimony on value because respondent's determination did not question the value of the player contracts. Petitioner would have been required to present additional evidence to address respondent's alternative argument, raised for the first time at trial. Accordingly, respondent bears the burden of proof with respect to the question of whether partnership's valuation of the player contracts was correct.

## B. Respondent's Alternative Argument

Having decided that section 1056 does not apply to the sale of a partnership interest, we address respondent's alternative argument that the basis of the player contracts was incorrectly computed under subchapter K. In this case, a distribution was deemed to have occurred to Bowlen and the remaining partner because of the section 708 constructive termination of the partnership when Bowlen purchased over a 50-percent partnership interest. Sec. 708(b)(1)(B); sec. 1.708-1(b)(1)(iv), Income Tax Regs.

Section 732(d) and the regulations thereunder, with respect to a liquidating distribution, require a basis adjustment in

accord with section 743(b) prior to a distribution to a partner who acquired his interest in the absence of a section 754 election, if three conditions exist: (1) The fair market value of the partnership's property (other than money) exceeds 110 percent of its adjusted basis to the partnership at the time the partnership interest was acquired, (2) upon liquidation of the partner's interest in the partnership immediately after acquisition, an allocation of basis under section 732(c) would have shifted basis to depreciable, depletable, or amortizable property from property not subject to these allowances, and (3) a special basis adjustment under section 743(b) would have changed the basis to the transferee partner of property actually distributed. Sec. 1.732-1(d)(4), Income Tax Regs.; see Rudd v. Commissioner, 79 T.C. 225, 240-246 (1982).

The partnership did not have a section 754 election in effect for 1984. Up to this point, the parties remain in accord. Their disagreement goes to the amount of the fair market value of the player contracts and whether the section 732(d) provisions applied.

The partnership's accountant determined that the section 732(d) mandatory basis adjustment rules applied, and the player contract bases were adjusted in accord with section 743(b) prior to the deemed distribution. The partnership used the section 743(b) adjusted basis, i.e., their purported fair market values,

to allocate basis among the distributed assets and assigned a basis of $36,121,385 to the player contracts.

Respondent argues that the value of the player contracts at the time of Bowlen's acquisition of a partnership interest was $45,695,000, which was the average of the estimates by other NFL teams. Due to respondent's premise that the partnership used an incorrect basis of $36,121,385, respondent argues that section 732(d) did not apply and that the partnership's basis in the player contracts is $21,288,373 in the absence of the section 743(b) adjustment. Because the partnership had amortized more than $21,288,373 prior to the years before this Court, no deduction would be allowable if respondent's argument is sustained. If, however, we find that the fair market value of the player contracts ($36,121,385) used by the partnership was correct, then respondent's argument must fail. As decided above, respondent bears the burden of proving that the fair market value of the player contracts was $45,695,000, instead of the $36,121,385 amount used by the partnership.[17]

To meet that burden, respondent relies on the $45,695,000 average of the four estimates obtained by Bowlen I as the true

---

[17] Petitioner agrees that a $45,695,000 fair market value for the player contracts would mean that secs. 732(d) and 743(b) would not apply resulting in a $21,288,373 basis in player contracts. Similarly, respondent agrees that a $36,121,385 value would result in the application of sec. 732(d) and related sections and that the basis of the contracts would have been $36,121,385.

fair market value so that the $45,695,000 value would not have triggered section 732(d).[18]  Respondent argues that the partnership's basis would have been $21,288,373 and that prior year's claimed amortization had already exceed that amount prior to the years under consideration.  Accordingly, under respondent's argument, the partnership would not be entitled to any further amortization.

The partnership, in accord with its accountant's analysis, used the $36,121,385 fair market value for purpose of determining whether the mandatory basis adjustment rules of section 732(d) apply.  Respondent did not present expert testimony regarding the value of the player contracts and relies on the simple expediency of averaging the four estimates used by the partnership in an attempt to reach a fair market value.  The estimates were not offered to establish the fair market value of the player contracts.  Instead they are a predicate for discussion of the section 1056 issue and whether it applies to a partnership transaction.

---

[18] Respondent's argument that sec. 732(d) would not apply is based on a $45,695,000 value for the player contracts, which in turn, would, according to respondent, result in a larger basis being allocated to depreciable and amortizable assets under sec. 732(d) than if a sec. 743(b) basis adjustment was not in effect. The parties did not debate whether each other's analysis was correct.  In essence they agreed, that if we find the value they propose to be correct, then the result they propose ensues.  We accept these concessions for purposes of this case.

Our analysis of the four estimates[19] shows them to be cursory and terse.  No explanation is provided for the estimate listed for each player.  The four estimates contain huge differences and inconsistencies when comparing particular players.  For example, John Elway's contract is estimated as high as $6,350,000 by the Chicago Bears and as low as $4 million by the Cleveland Browns.  With respect to Steve Busick, the Chicago Bears estimated $225,000 and the Houston Oilers $1,250,000.  Conversely, the Chicago Bears estimated $100,000 for Britt Freeman and the Houston Oilers $10,000.  We cannot tell whether these differences reflect the needs of those teams for a particular player's skills or result from some other consideration or factor.

The accountant for the partnership, after considering the estimates respondent relies on, reached a fair market value of $36,121,385.  The value used by the partnership is within the range of estimates of value by the four NFL teams.  We also note that the $36 million figure is a conservative amount.  Under these circumstances, respondent has not carried the burden of showing that the fair market value of the player contracts was more than the $36,121,385 used by the partnership or that the correct fair market value is the $45,695,000 relied on by respondent to show that section 732(d) would not apply.

---

[19] A summary of the four estimates was received in evidence and is attached to this opinion as the appendix.

Accordingly, we find that the mandatory basis adjustment of section 732(d) applies within the context of subchapter K and that Bowlen I properly computed the basis of the player contracts in accordance with the partnership provisions and is entitled to the amortization deduction in controversy.

To reflect the foregoing and due to concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>

# APPENDIX

APPRAISER

| NAME | (Chicago Bears) VANISI | (Cleveland Browns) BAILEY | (New York Giants) YOUNG | (Houston Oilers) HERZEG | TOTAL | AVERAGE |
|---|---|---|---|---|---|---|
| Aguilar, Joe | $100,000 | $150,000 | $100,000 | $10,000 | $360,000 | $90,000 |
| Alexander, Ray | 100,000 | 200,000 | 0 | 200,000 | 500,000 | 125,000 |
| Banaszak, Chris | 100,000 | 225,000 | 125,000 | 10,000 | 460,000 | 115,000 |
| Banks, Larry | 100,000 | 200,000 | 120,000 | 10,000 | 430,000 | 107,500 |
| Barnett, Dean | 125,000 | 200,000 | 150,000 | 10,000 | 485,000 | 121,250 |
| Barnett, Larry | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Bishop, Keith | 525,000 | 225,000 | 900,000 | 1,250,000 | 2,900,000 | 725,000 |
| Blinka, Stan | 275,000 | 250,000 | 300,000 | 10,000 | 835,000 | 208,750 |
| Bowyer, Walt | 150,000 | 175,000 | 400,000 | 100,000 | 825,000 | 206,250 |
| Boyd, Michael | 100,000 | 175,000 | 125,000 | 10,000 | 410,000 | 102,500 |
| Brewer, Chris | 150,000 | 225,000 | 400,000 | 200,000 | 975,000 | 243,750 |
| Brunner, Scott | 625,000 | 750,000 | 900,000 | 1,000,000 | 3,275,000 | 818,750 |
| Brunot, Rick | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Bryan, Billy | 1,125,000 | 225,000 | 1,500,000 | 800,000 | 3,650,000 | 912,500 |
| Buchannan, Mike | 100,000 | 175,000 | 125,000 | 10,000 | 410,000 | 102,500 |
| Busick, Steve | 225,000 | 250,000 | 900,000 | 1,250,000 | 2,625,000 | 656,250 |
| Carmody, Steve | 100,000 | 250,000 | 100,000 | 10,000 | 460,000 | 115,000 |
| Carswell, Ernest | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Carter, Rubin | 750,000 | 750,000 | 1,000,000 | 300,000 | 2,800,000 | 700,000 |
| Chavous, Barney | 1,150,000 | 400,000 | 1,200,000 | 500,000 | 3,250,000 | 812,500 |
| Coleman, Duane | 100,000 | 150,000 | 125,000 | 10,000 | 385,000 | 96,250 |
| Collins, Trent | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Comeaux, Darren | 125,000 | 175,000 | 300,000 | 100,000 | 700,000 | 175,000 |
| Cooper, Mark | 450,000 | 750,000 | 900,000 | 600,000 | 2,700,000 | 675,000 |
| Costello, Rocky | 100,000 | 125,000 | 125,000 | 10,000 | 360,000 | 90,000 |
| Davis, Billy | 100,000 | 225,000 | 125,000 | 10,000 | 460,000 | 115,000 |
| Davis, Jeff | 100,000 | 175,000 | 125,000 | 10,000 | 410,000 | 102,500 |
| Davis, Ricky | 100,000 | 175,000 | 125,000 | 10,000 | 410,000 | 102,500 |
| De Bourge, Dale | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| De Rose, Dan | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Dennison, Rick | 150,000 | 225,000 | 500,000 | 600,000 | 1,475,000 | 368,750 |
| Diorio, Jerry | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Dixon, Kevin | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Dodson, Lance | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Dupree, Myron | 125,000 | 250,000 | 225,000 | 50,000 | 650,000 | 162,500 |
| Egloff, Ron | 300,000 | 275,000 | 250,000 | 50,000 | 875,000 | 218,750 |
| Elway, John | 6,350,000 | 4,000,000 | 5,000,000 | 6,000,000 | 21,350,000 | 5,337,500 |
| Felknor, Bret | 125,000 | 175,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Fernandez, Jacinto | 100,000 | 175,000 | 125,000 | 10,000 | 410,000 | 102,500 |
| Fisher, Mike | 100,000 | 150,000 | 125,000 | 10,000 | 385,000 | 96,250 |
| Foley, Steve | 825,000 | 300,000 | 1,200,000 | 1,000,000 | 3,325,000 | 831,250 |
| Freeman, Britt | 100,000 | 150,000 | 125,000 | 10,000 | 385,000 | 96,250 |
| Freeman, Mike | 100,000 | 200,000 | 150,000 | 200,000 | 650,000 | 162,500 |
| Gaines, Charlie | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Garnett, Scott | 150,000 | 250,000 | 400,000 | 500,000 | 1,300,000 | 325,000 |
| Gearring, Vernon | 100,000 | 150,000 | 100,000 | 200,000 | 550,000 | 137,500 |
| Gilbert, Freddie | 0 | 0 | 0 | 0 | 0 | 0 |
| Gradishar, Randy | 0 | 0 | 0 | 0 | 0 | 0 |
| Graves, Marsharne | 100,000 | 150,000 | 200,000 | 10,000 | 460,000 | 115,000 |
| Greggs, Mark | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Harden, Mike | 775,000 | 250,000 | 900,000 | 700,000 | 2,625,000 | 656,250 |
| Harris, Weedy | 150,000 | 250,000 | 250,000 | 10,000 | 660,000 | 165,000 |
| Hawkins, Reco | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Hedderly, Russ | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Higginbotham, John | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Hollingsworth, Shawn | 100,000 | 175,000 | 150,000 | 10,000 | 435,000 | 108,750 |
| Hood, Winford | 150,000 | 200,000 | 400,000 | 500,000 | 1,250,000 | 312,500 |
| Howard, Paul | 925,000 | 250,000 | 900,000 | 100,000 | 2,175,000 | 543,750 |
| Hunley, Ricky | 0 | 0 | 0 | 0 | 0 | 0 |
| Jackson, Roger | 300,000 | 250,000 | 300,000 | 100,000 | 950,000 | 237,500 |
| Jackson, Tom | 625,000 | 300,000 | 1,200,000 | 200,000 | 2,325,000 | 581,250 |
| Jarman, Murray | 150,000 | 200,000 | 200,000 | 10,000 | 560,000 | 140,000 |
| Jenkins, Bob | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Jones, Demetrius | 100,000 | 125,000 | 120,000 | 10,000 | 355,000 | 88,750 |
| Jones, Rulon | 1,475,000 | 750,000 | 1,200,000 | 2,500,000 | 5,925,000 | 1,481,250 |
| Joyce, Jim | 100,000 | 125,000 | 125,000 | 10,000 | 360,000 | 90,000 |

| NAME | (Chicago Bears VANISI | (Cleveland Browns) BAILEY | (New York Giants) YOUNG | (Houston Oilers) HERZEG | TOTAL | AVERAGE |
|---|---|---|---|---|---|---|
| Karlis, Rich | 700,000 | 400,000 | 900,000 | 600,000 | 2,600,000 | 650,000 |
| Kay, Clarence | 150,000 | 250,000 | 600,000 | 1,250,000 | 2,250,000 | 562,500 |
| Kelley, Greg | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Kenneybrew, Carl | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Kragen, Greg | 100,000 | 200,000 | 125,000 | 200,000 | 625,000 | 156,250 |
| Kubiak, Gary | 225,000 | 500,000 | 600,000 | 1,000,000 | 2,325,000 | 581,250 |
| Lang, Gene | 150,000 | 250,000 | 200,000 | 200,000 | 800,000 | 200,000 |
| Lanier, Ken | 550,000 | 400,000 | 900,000 | 1,000,000 | 2,850,000 | 712,500 |
| Lasack, Duane | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Leary, Bill | 125,000 | 125,000 | 100,000 | 10,000 | 360,000 | 90,000 |
| Lilly, Tony | 650,000 | 250,000 | 700,000 | 600,000 | 2,200,000 | 550,000 |
| Logan, Dave | 375,000 | 200,000 | 1,200,000 | 10,000 | 1,785,000 | 446,250 |
| Lomeli, Dan | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Luck, Mike | 100,000 | 125,000 | 175,000 | 10,000 | 410,000 | 102,500 |
| Lytle, Rob | 0 | 200,000 | 300,000 | 10,000 | 510,000 | 127,500 |
| Manor, Brison | 275,000 | 300,000 | 300,000 | 100,000 | 975,000 | 243,750 |
| Massie, Rick | 0 | 0 | 0 | 0 | 0 | 0 |
| Mecklenburg, Karl | 250,000 | 200,000 | 600,000 | 0 | 1,050,000 | 262,500 |
| Micho, Bobby | 150,000 | 200,000 | 300,000 | 200,000 | 850,000 | 212,500 |
| Moen, Kevin | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Morgan, John | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Mullahey, Nick | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Muriaty, Gene | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Myers, Wilbur | 175,000 | 200,000 | 250,000 | 10,000 | 635,000 | 158,750 |
| Myles, Jesse | 175,000 | 250,000 | 250,000 | 200,000 | 875,000 | 218,750 |
| Naylor, Rick | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Neal, Alan | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Niko, Maomao | 125,000 | 200,000 | 150,000 | 10,000 | 485,000 | 121,250 |
| Norman, Chris | 100,000 | 200,000 | 175,000 | 600,000 | 1,075,000 | 268,750 |
| O'Brien, Eddie | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Osborn, Kelly | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Parros, Rick | 425,000 | 300,000 | 900,000 | 50,000 | 1,675,000 | 418,750 |
| Patterson, Jeff | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Poole, Jon | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Poole, Nathan | 150,000 | 225,000 | 200,000 | 50,000 | 625,000 | 156,250 |
| Prestridge, Luke | 525,000 | 400,000 | 500,000 | 200,000 | 1,625,000 | 406,250 |
| Price, Steve | 100,000 | 175,000 | 100,000 | 200,000 | 575,000 | 143,750 |
| Raikes, Jeff | 125,000 | 200,000 | 125,000 | 10,000 | 460,000 | 115,000 |
| Ramson, Eason | 225,000 | 300,000 | 600,000 | 10,000 | 1,135,000 | 283,750 |
| Reiner, Mike | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Robbins, Randy | 200,000 | 300,000 | 600,000 | 600,000 | 1,700,000 | 425,000 |
| Robinson, Capus | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Rogers, Shawn | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| [illegible] | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Russell, Marlin | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Ryan, Jim | 275,000 | 200,000 | 900,000 | 600,000 | 1,975,000 | 493,750 |
| Salazar, Robert | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Sampson, Clint | 350,000 | 500,000 | 600,000 | 600,000 | 2,050,000 | 512,500 |
| Sawyer, John | 275,000 | 300,000 | 400,000 | 10,000 | 985,000 | 246,250 |
| Scandrett, David | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Schafer, Steve | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Simmons, Melvin | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Simpson, Adrian | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Skudneski, David | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Small, George | 200,000 | 300,000 | 175,000 | 10,000 | 685,000 | 171,250 |
| Smith, Aaron | 100,000 | 250,000 | 300,000 | 200,000 | 850,000 | 212,500 |
| Smith, Alonzo | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Smith, Charlie | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Smith, Darryl | 100,000 | 125,000 | 100,000 | 10,000 | 335,000 | 83,750 |
| Smith, Dennis | 2,275,000 | 1,000,000 | 2,000,000 | 2,500,000 | 7,775,000 | 1,943,750 |
| Smith, John | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Smith, Reggie | 0 | 0 | 0 | 0 | 0 | 0 |
| Stachowski, Rich | 100,000 | 200,000 | 175,000 | 10,000 | 485,000 | 121,250 |
| Staff, Mike | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Stankavage, Scott | 100,000 | 250,000 | 250,000 | 10,000 | 610,000 | 152,500 |
| Studdard, Dave | 550,000 | 300,000 | 1,000,000 | 300,000 | 2,150,000 | 537,500 |
| Summers, Don | 100,000 | 125,000 | 175,000 | 200,000 | 600,000 | 150,000 |
| Sutton, Phil | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Swanke, Rob | 100,000 | 250,000 | 200,000 | 10,000 | 560,000 | 140,000 |

| NAME | (Chicago Bears) VANISI | (Cleveland Browns) BAILEY | (New York Giants) YOUNG | (Houston Oilers) HERZEG | TOTAL | AVERAGE |
|---|---|---|---|---|---|---|
|  | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Taylor, Joe | 150,000 | 300,000 | 400,000 | 10,000 | 860,000 | 215,000 |
| Thomas, Zack | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Thompson, Dale | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Thurson, Tommy | 100,000 | 200,000 | 125,000 | 10,000 | 435,000 | 108,750 |
| Thurston, Guy | 900,000 | 750,000 | 1,300,000 | 700,000 | 3,650,000 | 912,500 |
| Townsend, Andre | 100,000 | 200,000 | 0 | 10,000 | 310,000 | 77,500 |
| Uebel, Ralf | 175,000 | 250,000 | 300,000 | 150,000 | 875,000 | 218,750 |
| Uecker, Keith | 0 | 100,000 | 500,000 | 0 | 600,000 | 150,000 |
| Upchurch, Rick | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Veals, Dennis | 100,000 | 175,000 | 125,000 | 10,000 | 410,000 | 102,500 |
| Wade, Michael | 100,000 | 175,000 | 100,000 | 10,000 | 385,000 | 96,250 |
| Walker, Chuck | 100,000 | 175,000 | 125,000 | 10,000 | 410,000 | 102,500 |
| Walker, Eddie Ray | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Walsh, Eddie | 2,050,000 | 1,000,000 | 2,000,000 | 1,500,000 | 6,550,000 | 1,637,500 |
| Watson, Steve | 100,000 | 200,000 | 100,000 | 10,000 | 410,000 | 102,500 |
| Whetstone, Mike | 525,000 | 1,000,000 | 1,200,000 | 400,000 | 3,125,000 | 781,250 |
| Willhite, Gerald | 750,000 | 250,000 | 700,000 | 300,000 | 2,000,000 | 500,000 |
| Wilson, Steve | 375,000 | 750,000 | 1,200,000 | 400,000 | 2,725,000 | 681,250 |
| Winder, Sammy | 100,000 | 150,000 | 100,000 | 10,000 | 360,000 | 90,000 |
| Wise, Ben | 325,000 | 225,000 | 600,000 | 150,000 | 1,300,000 | 325,000 |
| Woodard, Kenneth | 300,000 | 175,000 | 600,000 | 50,000 | 1,125,000 | 281,250 |
| Wright, James | 1,425,000 | 1,000,000 | 1,500,000 | 600,000 | 4,525,000 | 1,131,250 |
| Wright, Louis | 100,000 | 275,000 | 100,000 | 10,000 | 485,000 | 121,250 |
| Wristen, John | 100,000 | 150,000 | 100,000 | 10,000 | 360,000 | 90,000 |
| Young, Barry | _____ | _____ | _____ | _____ | _____ | _____ |
| TOTAL | 44,325,000 | 43,450,000 | 59,215,000 | 35,790,000 | 182,780,000 | 45,695,000 |