E. NORMAN PETERSON MARITAL TRUST, Chemical Bank, Trustee, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 30, Docket 95–4001.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1995.

Decided March 4, 1996.

---

Michael I. Frankel, Carter, Ledyard & Milburn, New York City, (Richard B. Covey, New York City, of counsel), for Petitioner–Appellant.

Loretta C. Argrett, Assistant Attorney General, Bridget M. Rowan, Tax Division, U.S. Department of Justice, Washington, D.C. (Gary R. Allen, Kenneth L. Greene, of counsel), for Respondent–Appellee.

Before: KEARSE, LEVAL, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

Language does not have a "plain meaning" outside of its particular context. "You should have passed, dummy," means something entirely different at a bridge table from what it means on Superbowl Sunday. The same words signify very different things because the linguistic context has changed. In this case, the taxpayer has asked us to invalidate a Treasury regulation that defines the word "added" in a way that is consistent with half a century of tax law. The taxpayer

asserts that the plain meaning of the word cannot support the definition given to it in the Treasury's regulation. But in estate and gift tax law, "added" has a significance that, though different from its meaning in other contexts, is nonetheless readily comprehended. And in the language of transfer taxes, the Treasury's regulation is not only a reasonable reading of "added" as it is used in the statute that the regulation purports to interpret, it is one that fully accords both with what the legislature intended and with what all the parties can properly be held to have understood the word to mean.

## BACKGROUND

When E. Norman Peterson died in 1974, his will included a marital trust for the benefit of his second wife, Eleanor Peterson. According to the terms of the trust, Mrs. Peterson was to receive all of the income of the trust, and was given a general testamentary power of appointment over the corpus of the trust.[1] In addition, Mrs. Peterson had the right to withdraw one half of the principal during her lifetime. In the event that Mrs. Peterson did not exercise her testamentary power of appointment, Mr. Peterson's will provided that the principal was to be set aside in equal shares for Mr. Peterson's grandchildren. Mr. and Mrs. Peterson allegedly had a private understanding that she would not exercise her power of appointment, except to pay the estate tax attributable to the trust.

Mrs. Peterson died in 1987. Because she held a general testamentary power of appointment over the marital trust, the entire value of the trust was included in her gross estate pursuant to 26 U.S.C. § 2041. In her will, Mrs. Peterson exercised the power to direct that the estate tax attributable to the inclusion of the trust property in her estate should be paid from the trust. She specifically stated that she was not otherwise exercising the power. The property remaining in the trust after payment of the estate taxes was therefore transferred to Mr. Peterson's grandchildren, as he had specified in his will.

In 1988, Mrs. Peterson's estate filed a Federal Estate Tax Return, and included a form stating that the transfers from the marital trust to the grandchildren's trusts were subject to the Generation–Skipping Transfer Tax (GST), 26 U.S.C. §§ 2601–2663 (presumably because they came about as a result of her failure to exercise her general power of appointment), and that the GST due was $827,404. The trustees of the E. Norman Peterson Trust subsequently filed a statement with the Commissioner, challenging the above-mentioned GST liability and arguing that the Trust's GST liability should be reduced to $18,910.[2] The Internal Revenue Service disagreed, and notified the taxpayer that it had a tax deficiency of $810,925.

The Peterson Trust petitioned the Tax Court, under 26 U.S.C. § 6213, for a redetermination of the deficiency. The Tax Court accepted some of the taxpayer's arguments, but rejected petitioner's contention that Mrs. Peterson had not added to the marital trust the funds transferred to the grandchildren and that, therefore, the trust was not subject to the GST on the transfer of those funds. It did so by affirming, over the taxpayer's objection, the validity of the Treasury regulation defining the lapse of Mrs. Peterson's power of appointment as a constructive addition to the trust of the sum she had controlled. It is that issue that is appealed here.

## DISCUSSION

■■■ We review the Tax Court's legal conclusions *de novo.* *See Samuels, Kramer & Co. v. Commissioner,* 930 F.2d 975, 979 (2d

---

1. A general testamentary power allows the holder to appoint the corpus of the trust, by will, to anyone the holder chooses, including the holder's own estate or its creditors. *See* 26 U.S.C. § 2041(b). By structuring the trust in this manner, Mr. Peterson ensured that it would qualify for the marital deduction under 26 U.S.C. § 2056(b)(5). As a result, the trust was not taxed in his estate.

2. The GST reduction proposed by the Peterson Trust was based primarily on the contention that Mr. Peterson, rather than Mrs. Peterson, should be viewed as the transferor of the trust corpus to Mr. Peterson's grandchildren. If Mr. Peterson is viewed as the transferor, then all but a minute portion of the trust corpus would be exempt from the GST by § 1433(b)(3) of Pub.L. 99–514, which allowed pre–1990 transfers up to $2 million to each grandchild of a transferor.

Cir.1991), *cert. denied*, 502 U.S. 957, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991). In reviewing the validity of a Treasury Regulation, we accord the Commissioner's interpretation of the statute substantial deference, applying a strong presumption in favor of validity. *See Goodson–Todman Ents., Ltd. v. Commissioner*, 784 F.2d 66, 73–74 (2d Cir.1986). A regulation should "be declared invalid only if it is unreasonable or clearly contrary to the language or spirit of the statute it purports to implement." *Id.* at 74. However, "the deference paid to Treasury regulations is not boundless." *Id.* Particularly where—as here—a regulation is promulgated pursuant to the Commissioner's general authority to "prescribe all needful rules and regulations," 26 U.S.C. § 7805(a), rather than pursuant to a specific grant of authority, a court owes it less deference. *See United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). The fact that the regulation at issue is a temporary regulation does not change our analysis. Until the passage of final regulations, temporary regulations are entitled to the same weight we accord to final regulations. *Truck & Equipment Corp. of Harrisonburg v. Commissioner*, 98 T.C. 141, 149, 1992 WL 18381 (1992). *Cf. LeCroy Research Sys. Corp. v. Commissioner*, 751 F.2d 123, 127 (2d Cir.1984) (noting that temporary regulations, unlike proposed regulations, are binding).

■ Prior to the enactment of the GST, 26 U.S.C. §§ 2601–2663,[3] it was common for individuals seeking to reduce tax liability to bequeath their property in trust, with a life estate in one or more generations, and the remainder over to succeeding generations. *See* 5 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 133.1 (2d ed. 1993). Congress passed the GST to ensure that transfers of this sort, in which the transferee is two or more generations below the transferor, would be subject to a tax liability at least as great as that which would ordinarily have been imposed had the transfers been taxed at each generation level. *See* Staff of Joint Comm. on Taxation, 99th Cong., 2d Sess., *General Explanation of the Tax Reform Act of 1986* at 1263 (1987).

The effect of the GST, as enacted, can be draconian,[4] and because of it previously beneficial estate and trust arrangements became exceedingly undesirable. To protect taxpayers who had legitimately made trust and estate dispositions which, although sensible when made, had become very disadvantageous, and from which they could no longer escape, Congress created a limited "grandfathering" exception to the GST. It established an effective-date rule which provides, in relevant part, that the GST will not apply to "any generation-skipping transfer under a trust which was irrevocable on September 25, 1985, but only to the extent that such transfer is not made out of corpus added to the trust after September 25, 1985." Pub.L. 99–514, § 1433(b)(2)(A), 100 Stat. 2731.

The parties do not dispute that the transfer from the marital trust to Mr. Peterson's grandchildren was a generation-skipping transfer that would be subject to the GST unless excepted from its reach by the effective-date rule. The taxpayer argues, however, that since the marital trust became irrevocable when Mr. Peterson died, eleven years before September 25, 1985, the transfer before us is exempt from the GST. The Commissioner counters that the lapse of Mrs. Peterson's general power of appointment over the trust constituted a "constructive addition" to the trust, and that, because this addition took place on September 5, 1987—well after the effective date of the GST—the effective-date rule does not insulate the trust from GST liability.

The Commissioner bases her argument on an interpretive regulation, Temp.Treas.Reg. § 26.2601–1(b)(1)(v)(A), 53 Fed.Reg. 8445

---

**3.** The current GST was included in the Tax Reform Act of 1986, Pub.L. 99–514, §§ 1431–1433, 100 Stat. 2085, 2717–32. The 1986 Act repealed an earlier version of the GST, enacted in the Tax Reform Act of 1976, Pub.L. 94–455, § 2006, 90 Stat. 1520, 1879–90.

**4.** The GST is computed by multiplying the highest federal estate tax rate imposed at the time the transfer is made by the applicable "inclusion ratio" for the property transferred. 26 U.S.C. §§ 2641–2642.

(1988), corrected by 53 Fed.Reg. 18,839 (1988), promulgated pursuant to her general authority to make regulations defining and interpreting provisions of the tax code. *See* 26 U.S.C. § 7805. Temp.Treas.Reg. § 26.2601–1(b) defines what constitutes "corpus added to the trust" for the purposes of the above-quoted effective-date rule. The regulation provides, among other things, that "where any portion of a trust remains in the trust after the release, exercise, or lapse of a [general] power of appointment over that portion of the trust, ... the value of the entire portion of the trust subject to the power that was released, exercised, or lapsed will be treated as an addition to the trust." Temp.Treas.Reg. § 26.2601–1(b)(1)(v)(A). The first of several examples accompanying the regulations reads as follows:

> On June 19, 1980, H established an irrevocable trust with a corpus of $500,000. The trust instrument provides that the trustee shall distribute the entire income from the trust annually to H's wife, W, during her life. At W's death the remainder is to be distributed to H and W's grandson, GS. H also gave W a general power of appointment over one-half of the trust assets. On December 21, 1989, when the value of the trust corpus is $1,500,000, W dies without having exercised her general power of appointment. The value of one-half of the trust corpus, $750,000 ... is included in W's gross estate under section 2041(a) and is subject to tax under Chapter 11. Because the value of one-half of the trust corpus is subject to tax under Chapter 11 with respect to W's estate, W is treated as the transferor of that property for purposes of Chapter 13.... For purposes of the generation-skipping transfer tax, the lapse of W's power of appointment is treated as if $750,000 ... had been distributed to W and then transferred back to the trust. Thus, W is considered to have added $750,000 ... to the trust at the date of her death.

Temp.Treas.Reg. § 26–2601–1(b)(1)(v)(D), Example 1. This example of "constructive addition" to a trust presents circumstances nearly identical to those in the case before us. There is, therefore, no question that if the regulation is valid, the lapse of Mrs. Peterson's power of appointment is to be treated as an addition to the trust made after September 25, 1985, and the GST will apply to the transfer of that trust to Mr. Peterson's grandchildren.

The taxpayer argues that the regulation constitutes an unreasonable interpretation of the statute and hence is not valid.

## I.

The taxpayer maintains that the regulation is contrary to the plain language of the statute because the effective-date rule covers all transfers except where such transfers are "made out of corpus *added* to the trust after September 25, 1985." Pub.L. 99–514, § 1433(b)(2)(A) (emphasis added), 100 Stat. 2731. According to the taxpayer, the ordinary meaning of the word "added" cannot include the lapse of a power of appointment. Citing Webster's Dictionary, the taxpayer contends that the use of the word "added" requires an increase in the size of the trust. The constructive addition that is deemed by the regulations to have been made when Mrs. Peterson's power of appointment lapsed did not increase the size of the trust over which she had held the power. The fiction of constructive addition, according to the taxpayer, circumvents this plainly required aspect of addition, and is therefore an unreasonable interpretation of the statute.

What the taxpayer's argument ignores, however, is that words can only be given meaning in a particular context. *See Zicherman v. Korean Air Lines Co.,* —— U.S. ——, ——, 116 S.Ct. 629, 632, 133 L.Ed.2d 596 (1996) (In interpreting a provision of the Warsaw Convention, a unanimous Court noted that "the dictionary meaning of the [French] term *'dommage'* embraces harms that no legal system would compensate, [and] it must be acknowledged that the term is to be understood in its distinctively *legal* sense."). While the dictionary definition of "added" might suggest a requirement that the thing "added to" be actually increased in size, the meaning given to the term by the regulations is one long-recognized in the tax code.

For tax purposes, a general power of appointment has for many, many years been viewed as essentially identical to outright ownership of the property. *See* 5 Bittker & Lokken, ¶ 128.1, at 128–4 to 128–7. It is for this reason that property subject to a general appointment is included in a decedent's estate for estate tax purposes, even if, in a non-tax sense, it is not the taxpayer's property. *See* 26 U.S.C. § 2041. Similarly, the exercise, release, or lapse of such a power is treated, for gift tax purposes, as a taxable transfer of property by the individual possessing the power. *See* 26 U.S.C. § 2514(b).

When the Treasury regulations were promulgated, the Department examined—and rejected—precisely the interpretation of 26 U.S.C. § 2601 here put forward by the taxpayer. In fact, the appropriate interpretation of the word "added" in the statute was discussed (much earlier) during the promulgation of regulations designed for the 1976 precursor to today's GST. The Department noted that "[a] number of commentators stated that 'additions' to the corpus of a trust should only occur where property is conveyed to the trust from an outside source." 45 Fed.Reg. 53,124 (1980). After considering this view, along with the opinions of other commentators, and examining the legislative history, the Department concluded that this narrow dictionary definition of "added" would not be consistent with the entire scheme of the gift and estate tax laws.

The Department determined that "it is appropriate to subject property to the generation-skipping tax where an individual is, for gift and estate tax purposes, treated as owning the property." *Id.* As a number of commentors noted, the generation-skipping tax is "essentially complementary to the estate and gift taxes and burdensome legal and administrative questions may arise if traditional transfer tax concepts are not followed." *Id.* Because a general power of appointment over property is, for tax purposes, the same as outright ownership of the property, 26 U.S.C. § 2041, the Department concluded that treating lapses or releases of such a power as constructive additions would ensure that the GST was given the scope intended

by Congress. *Id.* at 53,124–25. Under the circumstances, this interpretation was certainly a "reasonable" construction of the statute's language.

That, however, does not end the matter. The taxpayer, in effect, contends that it is improper to hold Mrs. Peterson to an interpretation of statutory language which, even if reasonable in the context of transfer tax tradition, would violate the proper expectations of ordinary readers. If Mrs. Peterson had been justified in making her tax plans by looking exclusively at the language of the statute—that is, if no Treasury Regulation had been promulgated at the time that Mrs. Peterson's decision to transfer the funds to her husband's grandchildren became irrevocable—the taxpayer's argument might be stronger. Thus, it is possible that, had the Commissioner sought to apply a novel and later-drafted regulation to her, we might view this case differently. Statutes frequently include ambiguous terms, or terms that have a usage in ordinary language that is different from their traditional (and intended) statutory meaning. The appropriate role of regulations is precisely to help clarify such ambiguities. If the particular language used in a statute is highly susceptible to misunderstanding by a lay person, and if the clarification which the regulations are intended to provide is available only after ordinary people have made choices in reliance on the more common meaning of a statutory term, it might be that a situation of such substantial unfairness would arise that it would be permissible to apply the late-coming regulations only prospectively.

We need not, however, consider what we would hold if the interpretation that these regulations give to the statute were novel and had been promulgated only after Mrs. Peterson's power of appointment had lapsed. While the current regulations were in fact implemented after Mrs. Peterson's death, regulations giving a nearly identical interpretation to the precursor GST statute had been in place for a number of years. *See* 26 C.F.R. § 26.2601–1; 45 Fed.Reg. 53,1254. These regulations were more than sufficient to put Mrs. Peterson on notice as to the meaning of the statutory provision. For, like

the current regulations, they made it abundantly clear that those drafting the tax code intended to include as taxable under the GST constructive additions resulting from the lapse of a general power of appointment over a trust.

Moreover, the fact that the regulations interpreting the 1976 GST were in existence at the time Congress enacted the 1986 GST has a significance beyond the notice it provided to the taxpayer. A regulation that remains essentially unchanged during the process of congressional reenactment of a statute is "deemed to have received congressional approval and have the effect of law." *Helvering v. Winmill,* 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938). We found no suggestion, either in the language of the 1986 GST or in its legislative history, that Congress was dissatisfied with the interpretation of the effective date provision included in the then-existing Treasury Regulations.[5] Under the circumstances, we would be rash indeed were we to declare invalid the Treasury's consistently held interpretation.

## II.

■ The taxpayer argues that, even if the regulation is a reasonable interpretation of the language of the statute, we should conclude that it is invalid because it does not comport with the statute's purpose. While acknowledging that the GST was enacted precisely to tax the generation skipping transfers which the Petersons sought to achieve, the taxpayer argues that the effec-

tive-date rule was meant to exempt a broader range of trusts from the GST than the applicable regulation allows.

Taxpayer contends that the intention behind the effective date provision—to avoid punishing individuals who established trusts in reliance on the old legal rules—would be best served by giving the Peterson Trust the benefit of the effective date rule. Mr. Peterson established the trust before he could have known about—or even anticipated—the GST. His wife's subsequent actions appear to have been motivated by respect for his wishes, rather than by a desire to evade the new tax rules. And, the whole arrangement was not one created by clever estate lawyers seeking to sneak additional funds into trusts that would enjoy the grandfathering protection.

■ All these facts, however—even were we to accept them as true—misperceive the point of the effective date rule. The rule was not enacted to allow taxpayers who, in good faith and without intent to evade taxes, seek to continue benefitting from a tax advantage that Congress has eliminated. It was designed, instead, to protect those taxpayers who, on the basis of pre-existing rules, made arrangements from which they could not reasonably escape and which, in retrospect, had become singularly undesirable.[6] By giving Mrs. Peterson a general power of appointment over the trust, Mr. Peterson created an arrangement which was desirable under then-existing tax laws and which could be reworked completely should the laws change,

---

5. There is, if anything, some indication in the legislative history of the 1986 GST that the legislature considered the effective-date provision to be as interpreted in Treas.Reg. 26.2601–1(e)(3). *See, e.g.,* 132 Cong.Rec. H8362 (Sept. 25, 1986) (Representative Rostenkowski discussed the effective-date provision and noted that the grandfathering would apply to "a trust which includes a limited power of appointment," but made no reference to its application to a trust subject to a general power of appointment); 132 Cong.Rec. S13,952 (Sept. 27, 1986) (Senators Bentsen and Packwood conducted a colloquy to the same effect). In keeping with these references to limited powers of appointment, the regulations distinguish between general and limited powers for the purposes of the constructive addition definition. *See* Temp.Treas.Reg. § 26.2601–1(b)(1)(v)(B), 53 Fed.Reg. 8445 (1988).

6. This understanding of the purpose behind the effective date rule is underscored by the other provisions of the rule. First, the rule provided that the GST would not apply to transfers made by wills that had been executed before the date of enactment of the GST (October 22, 1986) if the decedent died before January 1, 1987. Pub.L. 99–514, § 1433(b)(2)(B). This exception ensured that an individual who did not have a reasonable time between the enactment of the law and his death to alter his will would not be penalized by the new provision. Second, the effective date rule allowed an exception for any individual who was "under a mental disability to change the disposition of his property and did not regain his competence to dispose of such property before the date of his death." Pub.L. 99–514, § 1433(b)(2)(C).

as they in fact did. There is no reason to "grandfather" such a mutable arrangement, and Congress has given no indication that it wished to do so.

In addition, by giving Mrs. Peterson a general testamentary power of appointment, rather than simply leaving the money in trust for his grandchildren, Mr. Peterson ensured that the money would be accessible if it were needed in ways other than for his grandchildren's future use. Mrs. Peterson's "ownership" of the trust corpus through her general power of appointment was not a fiction. She had, at all times, the power to decide what to do with those funds. She could take up to half the property during her life. And she could appoint the rest by will to anyone she chose, including her estate or the creditors of her estate. In other words, every bit of the property was subject to being used for her own benefit.[7] To allow a grandfathering exemption to apply in such circumstances would permit taxpayers to take permanent advantage of favorable provisions of the current law, while leaving them free to make any and all changes that altered laws or circumstances might make desirable. Even if it be the case that such was not Mr. Peterson's intention, it would not be long before others caught on and used analogous arrangements expressly to assure for themselves the benefits of the current law while leaving their heirs full power to take advantage of, and respond freely to, any future changes in law or circumstances.

Mr. Peterson did not tie himself or his heirs up at all. He gave Mrs. Peterson a power over the trust that was great enough to undo any harm that stemmed from reliance on the absence of a GST at the time the trust was created. It is this fact that, in the end, not only gives additional support to the view that the Treasury Regulation on constructive additions is a reasonable one, but also negates all of the taxpayer's arguments

that on "policy grounds" the exemption should apply in this case.

## CONCLUSION

We hold Temp.Treas.Reg. § 26.2601–1(b)(1)(v)(A) to be a valid interpretation of the GST. Accordingly, since § 1433(b)(2)(A) does not exempt this trust from the GST, we affirm the judgment of the Tax Court.

---

**7.** Nor does the alleged private understanding that Mrs. Peterson would not exercise her general power of appointment—except to pay estate taxes attributable to the trust—alter this. Were that agreement enforceable, it would have caused Mr. Peterson's estate to lose the marital deduction on the trust assets. *See* 26 U.S.C. § 2056(b)(5) (requiring that the surviving spouse be given a general power of appointment over

trust assets in order for the property to qualify for the marital deduction). Since the estate took the deduction, it is hard to know who could have enforced the "agreement" against Mrs. Peterson if she had chosen to breach it. It follows that the "agreement" cannot be deemed to limit Mrs. Peterson's power over the trust in any relevant way.