T.C. Summary Opinion 2010-136

UNITED STATES TAX COURT

RANDY M. AND CARMENE M. JAVORSKI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2107-09S.          Filed September 13, 2010.

<u>Gary C. Randall</u> and <u>James J. Workland</u>, for petitioners.

<u>Robert V. Boeshaar</u>, for respondent.

VASQUEZ, <u>Judge</u>:  This case was heard pursuant to the
provisions of section 7463 of the Internal Revenue Code (Code) in
effect when the petition was filed.[1]  Pursuant to section
7463(b), the decision to be entered is not reviewable by any

---

[1]  Unless otherwise indicated, all section references are to
the Code in effect for the year in issue, and all Rule references
are to the Tax Court Rules of Practice and Procedure.

other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a $27,228 deficiency[2] in petitioners' 2005 Federal income tax and a $5,445.60 accuracy-related penalty under section 6662(a). After concessions,[3] the issues for decision are whether petitioners are entitled to: (1) A bad debt deduction under section 166 of $382,000; (2) a capital loss deduction for a worthless security under section 165(g); (3) a deduction of $10,000 as an ordinary and necessary business expense under section 162; and (4) a deduction for interest

---

[2] The deficiency includes self-employment tax of $10,592. Respondent also allowed petitioners a deduction for self-employment tax of $5,296. These issues involve computational matters to be resolved in the parties' Rule 155 computations consistent with the Court's opinion. See secs. 164(f), 1401, 1402.

Respondent made adjustments to petitioners' deductions for medical/dental expenses and miscellaneous itemized deductions, because after adjustments to petitioners' gross income, the amounts did not exceed the 7.5- and 2-percent floors of secs. 213(a) and 67(a), respectively. Respondent also disallowed petitioners' claimed net operating loss. These issues involve computational matters to be resolved in the parties' Rule 155 computations consistent with the Court's opinion. See secs. 67(a), 172(c) and (d), 213(a).

[3] Respondent concedes that petitioners are not liable for the accuracy-related penalty under sec. 6662(a). Petitioners concede that the initial $150,000 equity investment in Lucca Interiors, Inc., discussed infra, for which a stock certificate was issued does not give rise to a bad debt deduction. Finally, the parties agree that petitioners are entitled to the following expenses: (1) $1,692 for supplies; (2) $3,773 for meals and entertainment; (3) $5,018 for travel; (4) $965 for gifts; and (5) $2,657 for telephone/pager.

payments totaling $31,709 under section 163 as either interest accrued in connection with a trade or business or as qualified residence interest.

## Background

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated herein by this reference. Petitioners resided in Washington State when the petition was filed.

In 2005 and for the past 20 years Randy Javorski (petitioner) has worked as an independent manufacturers sales representative for 10 to 12 furniture and lighting manufacturers, including Design Institute of America (DIA). In this capacity petitioner received commissions when he arranged sales between furniture stores and manufacturers he represented.

Petitioner had long considered opening a furniture store, and, in 2002, petitioner met with Stephan Eberle (Mr. Eberle) to discuss this possibility. Together, petitioner and Mr. Eberle drafted a basic business plan for what became Lucca Interiors, Inc. (Lucca). Lucca was organized as a Canadian corporation that owned and operated a furniture store in Vancouver, British Columbia.

Petitioner had dual motives for establishing Lucca. One reason was to fill a niche in the Vancouver furniture market. The second reason was to establish a client (i.e., Lucca) that

would purchase furniture from manufacturers petitioner represented. Petitioner earned a commission whenever he arranged transactions between Lucca and manufacturers he represented. Petitioner anticipated earning steady commissions with the creation of Lucca because he believed Lucca would consistently purchase goods through him. Lucca purchased much of its merchandise, including goods from DIA, through petitioner.

Petitioner contributed $150,000[4] to Lucca in exchange for a 49-percent ownership interest. He obtained the funds to incorporate Lucca by opening a line of credit[5] (LOC 5278) with Washington Mutual that had a maximum credit line of $280,000. Mr. Eberle did not contribute any capital to the venture at this time or any other, but he received the remaining 51 percent of the stock for his role as Lucca's manager. In 2003 Lucca opened its doors for business.[6]

---

[4] All of petitioner's transfers to Lucca were drawn from one of three lines of credit that he opened.

[5] Every line of credit petitioner used to transfer funds to Lucca was issued to both petitioner and Mrs. Javorski. However, the lines of credit were used only by petitioner in connection with Lucca. Thus, we will refer only to petitioner opening lines of credit.

[6] Petitioner continued to transact business with other furniture stores after Lucca was formed and never considered himself an employee of Lucca. During the first year Lucca conducted business approximately 5 to 10 percent of petitioner's sales as a representative were to Lucca.

To meet Lucca's operating costs and obligations to creditors, petitioner continued to draw money on LOC 5278. On July 8, 28, and 30, 2003, petitioner transferred $50,000, $10,000, and $40,000, respectively, to Lucca. On September 5, 2003, petitioner transferred another $30,000 to Lucca.

Petitioner needed additional funds to meet Lucca's financial demands. In September 2003 petitioner opened a second line of credit (LOC 7826) secured by petitioners' rental property. On or about September 15, 2003, petitioner transferred $120,300.87 to Lucca.

Lucca's financial prospects quickly diminished in 2004. By that time customers had stopped visiting the store, and Lucca needed to find new clientele. Lucca had incurred many debts and needed more money to meet its obligations. To further finance Lucca's operations, petitioner transferred $28,890.25 to Lucca on or about March 19, 2004, and $40,000 on or about June 10, 2004.

By September 2004 petitioner had almost exceeded his LOC 5278 credit limit, so petitioner replaced LOC 5278 with LOC 3789, which was secured by petitioners' principal residence, on or about September 27, 2004. Petitioner used LOC 3789 to satisfy the balance of LOC 5278 and transferred $40,000 to Lucca on or about September 27, 2004.

Lucca accumulated a $30,000 debt for goods purchased from DIA in 2004. DIA knew of petitioner's relationship to Lucca and

encouraged petitioner to sell DIA's products to Lucca.  However, as Lucca's debt climbed, DIA withheld special orders from Lucca until DIA received payment for its goods.  In order to release the special orders petitioner made two payments totaling $2,249.10 to DIA in November 2004.

While the $2,249.10 payment was enough to release the special orders, DIA sought more money from Lucca to reduce Lucca's debt.  Lucca's indebtedness to DIA in 2004 prompted DIA's president to call petitioner and threaten him with the possibility of losing his position as DIA's representative if Lucca did not satisfy its debt.  In response, petitioner paid DIA $10,000 on January 20, 2005, to further reduce the amount of Lucca's debt to DIA and to maintain his position as DIA's representative.

Unfortunately for petitioner, Lucca was not successful and filed for bankruptcy on March 15, 2005.  Lucca's assets were assigned to the bankruptcy trustee, MacKay & Company, Ltd. (MacKay), on March 15, 2005.

MacKay prepared a preliminary report on March 15, 2005, regarding the administration of Lucca's estate.  The report stated:  "It appears that there will be no distribution to unsecured creditors".  Petitioner never pursued a claim against Lucca during the bankruptcy proceedings to recover any of his

payments, but, as MacKay's preliminary report suggests, recovery for unsecured creditors appeared unlikely.

On April 28, 2006, MacKay prepared the Notice of Final Dividend and Application for Discharge of Trustee for Lucca. MacKay found that there were no funds available for distribution. Lucca was dissolved on July 31, 2006.

In 2005 petitioners paid mortgage interest of $14,444 for funds borrowed from LOC 7826 and $17,264 for funds borrowed from LOC 3789.

With the exception of petitioner's $150,000 initial contribution to Lucca, for which Lucca issued stock to petitioner, petitioners did not provide any documentation that explained how petitioner or Lucca treated the remaining $382,000 petitioner transferred to Lucca (i.e., as a loan or a contribution). Lucca recorded the transfers by writing down in its records that it received cash from petitioner. However, we do not know anything more about the records because they were unavailable. Furthermore, petitioner expected to recover his transfers only in the event that Lucca became profitable.

## Discussion

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to the deductions claimed. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioners do not allege, nor do we find, that section 7491(a) applies.

I.  Section 166 Business Bad Debt Deduction

Section 166(a) provides as a general rule that a deduction shall be allowed for any debt which becomes worthless within the taxable year.  Only a bona fide debt can be deducted, however.  A bona fide debt arises when a debtor-creditor relationship is formed because of an unconditional, valid, and enforceable obligation to pay a fixed or determinable sum of money.  Boatner v. Commissioner, T.C. Memo. 1997-379, affd. without published opinion 164 F.3d 629 (9th Cir. 1998); sec. 1.166-1(c), Income Tax Regs.  A gift or contribution to capital shall not be considered a debt for purposes of section 166.  Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs.

Petitioners argue that the transfers totaling $382,000, including amounts paid directly to Lucca or on its behalf, were loans and not equity investments.  The question of whether transfers of funds to closely held corporations constitute debt or equity must be decided on the basis of all the relevant facts and circumstances.  Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).  Taxpayers generally bear the burden of proving that the transfers constituted loans and not equity investments. Rule 142(a).

Courts look to the following nonexclusive factors to evaluate the nature of transfers of funds to closely held corporations:  (1) The names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions.  Bauer v. Commissioner, 748 F.2d 1365, 1368 (9th Cir. 1984) (citing A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970)), revg. T.C. Memo. 1983-120.

These factors serve only as aids in evaluating whether transfers of funds to closely held corporations should be regarded as capital contributions or as bona fide loans.  Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). No single factor is controlling.  Dixie Dairies Corp. v. Commissioner, supra at 493.  However, the ultimate question is whether there was a genuine intention to create a debt, with a reasonable expectation of repayment, and whether that intention comported with the economic reality of creating a debtor-creditor

relationship.  <u>Litton Bus. Sys., Inc. v. Commissioner</u>, 61 T.C. 367, 377 (1973).

Transfers to closely held corporations by controlling shareholders are subject to heightened scrutiny, and labels attached to such transfers by the controlling shareholders through bookkeeping entries or testimony have limited significance unless these labels are supported by objective evidence.[7]  <u>Fin Hay Realty Co. v. United States</u>, <u>supra</u> at 697; <u>Dixie Dairies Corp. v. Commissioner</u>, <u>supra</u> at 495; see also <u>Bauer v. Commissioner</u>, <u>supra</u> at 1367-1368; <u>A.R. Lantz Co. v. United States</u>, <u>supra</u>.

Rather than analyze in this opinion the facts here involved in light of every factor on the debt-equity checklists, we confine our discussion to those points we find most pertinent.

First, petitioners' posttransaction characterization of the transfers totaling $382,000 as loans is undermined by the lack of any formal indicia of bona fide debt.  For example, petitioner's transfers to Lucca were not accompanied by a note specifying a maturity date, an interest rate, or a repayment schedule.  A second factor that weighs against a debtor-creditor relationship

---

[7]  While petitioner was not the controlling shareholder on account of his minority ownership interest, he effectively controlled Lucca.  Mr. Eberle was the active manager, but his decisions were subject to petitioner's approval; and petitioner had contributed all of the operating capital.  Consequently, we will closely scrutinize petitioner's characterization of his transfers.

is petitioner's continued investment in a struggling company without receiving any security interest in the company. "It is unreasonable to conclude that * * * a prudent creditor would continue to make unsecured loans to a debtor with expectation of repayment." Dodd v. Commissioner, 298 F.2d 570, 578 (4th Cir. 1962), affg. T.C. Memo. 1961-8. Third, petitioner's expectation of recouping his transfers only in the event that Lucca became successful undermines the "valid and enforceable obligation" element. See sec. 1.166-1(c), Income Tax Regs. Finally, petitioners provided no documentary evidence that Lucca treated the transfers as loans on its books.[8]

Despite the absence of formal aspects that typically denote a bona fide debt, petitioners contend that this case is analogous to Johnson v. Commissioner, T.C. Memo. 1977-436, and, consequently, their transfers should be characterized as bona fide debt. We disagree.

First, in Johnson, the taxpayer provided the Court with minutes from two board of directors meetings that not only discussed the need to repay but later ratified the corporation's obligation to repay any advances. Second, the taxpayer in that case demonstrated that the corporation that made the transfers recorded them as accounts receivable and the corporation

---

[8] We note as an additional factor that petitioner did not file a claim in Lucca's bankruptcy proceeding.

receiving the transfers recorded them as accounts payable. Third, the payments were characterized by the Court as bona fide debt only so long as a reasonable expectation of repayment existed. Once the taxpayer's expectation of repayment became unreasonable because of the corporation's unlikely chance of recovery, the Court characterized the transfers as equity investments. Id.

It is true that this case resembles Johnson in the sense that no note was executed, no repayment schedule was set, and no interest rate was attached to the transfers. However, other factors in Johnson, which are not present in petitioners' case, clearly denoted the parties' intent to create a bona fide debt and an enforceable obligation to repay the transfers. Id.

Here, the only evidence of bona fide debt was petitioner's self-serving testimony that he expected to be repaid for his transfers and that Lucca was obligated to repay them. Lucca did not register the transfers as accounts payable. Lucca's business had already withered by 2004, yet petitioner continued to make transfers to Lucca throughout the year. With little to no business in 2004, it was unreasonable for petitioner to expect repayment of his transfers.

Petitioners did not provide business records or corroborating testimony that would objectively reveal petitioner's or Lucca's intent. Applying heightened scrutiny to

this case because petitioner is so closely connected to Lucca, we find that petitioner's testimony alone is insufficient to characterize the transfers as loans.  Therefore, without formal elements typically evincing a debt instrument and objective evidence supporting petitioners' characterization of the transfers, we find that petitioner's transfers to Lucca were not bona fide debt.  Consequently, petitioners are not entitled to a bad debt deduction under section 166.

II.  Section 165(g) Worthless Security Deduction

As we found above, petitioner's transfers constituted equity, not debt.  Petitioners argue that they are entitled to deduct as a capital loss for a worthless security in 2005 the amount of petitioner's basis in his Lucca stock.  Respondent argues that, to the extent petitioner's Lucca stock became worthless, it did not do so until 2006.

Under section 165(g), securities which are capital assets that become worthless during a taxable year are "treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset."  Sec. 165(g)(1).[9]  For purposes of section 165(g), the term "security" includes a share of stock in a corporation.  Sec. 165(g)(2)(A).

---

[9]  Sec. 1244 does not apply to petitioners' stock because Lucca is not a domestic corporation.

For a taxpayer to qualify for a capital loss deduction under section 165(g), a stock interest in a corporation must be wholly worthless. Sec. 1.165-5(c), Income Tax Regs. Whether the stock interest in the corporation is worthless and the taxable year in which such worthlessness occurred are questions of fact with respect to which petitioners generally bear the burden of proof. See Rule 142(a); Boehm v. Commissioner, 326 U.S. 287, 294 (1945); Welch v. Helvering, 290 U.S. at 115. Stock is worthless if it has neither liquidating value nor potential value. Austin Co. v. Commissioner, 71 T.C. 955, 970 (1979). A corporation's stock has liquidating value if its assets exceed its liabilities. Id. A corporation's stock has potential value if there is a reasonable expectation that it will become valuable in the future. Morton v. Commissioner, 38 B.T.A. 1270, 1278 (1938), affd. 112 F.2d 320 (7th Cir. 1940). A corporation's stock may be worthless if the corporation declares bankruptcy, ceases to operate, liquidates, or has a receiver appointed, because these events can destroy the stock's potential value. Id.

Petitioner's stock in Lucca became worthless in 2005 because Lucca lacked liquidating and potential value. Lucca filed for bankruptcy on March 15, 2005. On the same day MacKay was appointed as Lucca's bankruptcy trustee. MacKay found that Lucca's liabilities exceeded its assets. Thus, there was no liquidating value. Moreover, Lucca had no prospects of

recovering from its financial problems and had decided to dissolve. Consequently, petitioner could not reasonably expect the stock to gain any future value. Therefore, petitioners are entitled to a deduction for worthless securities equal to petitioner's adjusted basis in his Lucca stock.[10]

III. Section 162(a) Deduction for $10,000

Taxpayers are allowed a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business. Sec. 162(a). Whether an expenditure is ordinary and necessary is generally a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). Generally, for an expenditure to be an ordinary and necessary business expense, the taxpayer must show a bona fide business purpose for the expenditure; there must be a proximate relationship between the expenditure and the business of the taxpayer. Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650 (1962); Henry v. Commissioner, 36 T.C. 879 (1961).

To be "necessary" within the meaning of section 162, an expense needs to be "appropriate and helpful" to the taxpayer's

---

[10] The basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in sec. 1011 for determining the loss from the sale or other disposition of property. Sec. 165(b). Petitioner's cost basis in his Lucca stock, presumably $150,000, was increased by the amounts described above that he subsequently contributed to Lucca. See sec. 1016(a); Commissioner v. Fink, 483 U.S. 89, 94 (1987) (a shareholder is entitled to increase the basis of his shares by the amount of cash contributed to the corporation's capital, even if the other shareholders make no contribution at all).

business.  Welch v. Helvering, supra at 113.  The requirement
that an expense be "ordinary" connotes that "the transaction
which gives rise to it must be of common or frequent occurrence
in the type of business involved."  Deputy v. du Pont, 308 U.S.
488, 495 (1940) (citing Welch v. Helvering, supra at 114).

Petitioners argue that the $10,000 payment to DIA on behalf
of Lucca was an ordinary and necessary business expense.  A
taxpayer generally may not deduct the payment of another person's
expense.  See Deputy v. du Pont, supra; Dietrick v. Commissioner,
881 F.2d 336 (6th Cir. 1989), affg. T.C. Memo. 1988-180; Betson
v. Commissioner, 802 F.2d 365, 368 (9th Cir. 1986) (shareholder's
payment of corporate obligation is not ordinary and necessary
under section 162(a)), affg. in part and revg. in part T.C. Memo.
1984-264; Lohrke v. Commissioner, 48 T.C. 679 (1967).  However,
where a taxpayer can show that the payment of another's expense
protected or promoted the taxpayer's own business, then such
payment may be deductible.  Square D Co. v. Commissioner, 121
T.C. 168, 200 (2003); Hood v. Commissioner, 115 T.C. 172, 180-181
(2000); Lohrke v. Commissioner, supra at 688.  Typically in these
circumstances, the original obligor is unable to make payment,
and the taxpayer satisfies the obligation to protect or promote
his interests.  See Hood v. Commissioner, supra at 181.

Petitioner's payment to DIA was made expressly for the
preservation of his own business.  Petitioner earned commissions

from DIA whenever a furniture store bought DIA's products through him.  In 2005 Lucca owed approximately $30,000 for goods purchased from DIA through petitioner.  Despite petitioner's and Mr. Eberle's best efforts, Lucca did not recover from its financial problems and, as a result, Lucca could not pay its debts to DIA.

To recover a portion of Lucca's debts to DIA, DIA's president threatened petitioner with the possibility of losing his position as DIA's representative.  In order to avoid losing his position with DIA, a manufacturer that was important to him, he paid DIA $10,000.

Moreover, Lucca had little prospect of recovery because it could not attract business.  The $10,000 payment on Lucca's behalf would have little impact on Lucca's debts to its creditors.  Hence, the $10,000 payment was primarily for the preservation of petitioner's business as a representative.

Had petitioner lost DIA's business, he would have lost a significant portion of his income.  Therefore, petitioner paid DIA to protect his business as a representative.  Consequently, petitioners are entitled to deduct the $10,000 payment under section 162(a).

IV.  Section 163 Deduction of $31,709 of Interest Payments

Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness.  However,

section 163(h) disallows deductions of personal interest accrued during the taxable year in the case of a taxpayer other than a corporation.  Personal interest is any interest allowable as a deduction other than interest listed in section 163(h)(2).  Petitioners argue that their interest is either interest paid or accrued on indebtedness that is properly allocable to a trade or business or qualified residence interest, and therefore it is not personal interest.  See sec. 163(h)(2)(A), (D).

A.    Deduction of Interest Properly Allocable to a Trade or Business

For petitioners to deduct interest under section 163(h)(2)(A), the interest expense must be "properly allocable to a trade or business".  Section 1.163-8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987), provides the rules for the allocation of interest expense for purposes of section 163(h).[11]  Robinson v. Commissioner, 119 T.C. 44, 70 (2002).  Debt is allocated to expenditures in accordance with the use of the debt proceeds.  Sec. 1.163-8T(c)(1), Temporary Income Tax Regs., 52 Fed. Reg. 25000 (July 2, 1987).  In general, interest expense accruing on a debt during any period is allocated to expenditures in the same manner as the debt is allocated.

---

[11]  Temporary regulations are entitled to the same weight as final regulations.  See Peterson Marital Trust v. Commissioner, 102 T.C. 790, 797 (1994), affd. 78 F.3d 795 (2d Cir. 1996); Truck & Equip. Corp. v. Commissioner, 98 T.C. 141, 149 (1992).

As we found above, the circumstances surrounding the $10,000 payment that petitioner made directly to DIA was for the purpose of protecting and promoting his business as a representative. Thus, the interest paid or accrued on $10,000 of indebtedness is properly allocable to petitioner's business as a representative. Consequently, petitioner is entitled to deduct the amount of interest attributable to $10,000 of indebtedness.

The remaining interest paid or accrued on petitioners' indebtedness may not be deducted as interest accrued in connection with petitioner's business as a representative. Petitioner contributed the remaining funds to Lucca to meet its operating costs. Thus, the remaining interest that he paid on the indebtedness is properly allocable to Lucca's business, not to his business as a representative. That being the case, petitioners are not entitled to deduct the remaining interest under section 163(h)(2)(A).

B. Deduction of Interest as Qualified Residence Interest

Petitioners' alternative argument is that the interest paid on the loans is qualified residence interest. To be deductible as qualified residence interest, petitioners' indebtedness must be either interest paid or accrued on acquisition indebtedness or interest paid or accrued on home equity indebtedness during the taxable year. See sec. 163(h)(3)(A).

### 1. Acquisition Indebtedness

"Acquisition indebtedness" means any indebtedness which is incurred in acquiring, constructing, or substantially improving any qualified residence of the taxpayer, and is secured by such residence. Sec. 163(h)(3)(B).

The funds petitioner borrowed were either contributed to Lucca or were used to pay Lucca's debts to DIA. Consequently, petitioners' interest was not paid or accrued on indebtedness used to acquire, construct, or substantially improve a qualified residence.

### 2. Home Equity Indebtedness

"Home equity indebtedness" means any indebtedness (other than acquisition indebtedness) secured by a qualified residence to the extent the aggregate amount of such indebtedness does not exceed the fair market value of such qualified residence reduced by the amount of acquisition indebtedness with respect to such residence. Sec. 163(h)(3)(C).

Petitioners have not provided any information regarding the fair market value of either the principal residence or the rental property, nor have they provided any documents illustrating the amount of acquisition indebtedness, if any, attached to either of the two properties. Consequently, without values to calculate whether the indebtedness exceeded the fair market value minus acquisition indebtedness, petitioners may not deduct their

interest payments as home equity indebtedness.  See sec. 6001; sec. 1.6001-1(a), (e), Income Tax Regs.

In reaching our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.